STATE OF NORTH CAROLINA v. MELVIN JAMES HARDY, JR.

No. 169A99

(Filed 21 December 2000)

### 1. Jury— peremptory challenge—black prospective juror—race-neutral explanations

The trial court did not err in a capital trial by overruling defendant's objection to the State's use of a peremptory challenge to strike from the jury a black prospective juror, because: (1) the prosecutor gave race-neutral explanations for the challenge after defendant made a prima facie showing of potential purposeful discrimination, including the prospective juror's limited education, his limited ability to read and write, his failure to answer all questions on the juror questionnaire, his statement that he had never considered his views on the death penalty until that day, and the prosecutor's impression that the prospective juror may be out of touch with reality; and (2) defendant offered no rebuttal at trial to show that any explanation given by the prosecution was a pretext.

### 2. Constitutional Law— self-incrimination—trial court's instruction—defendant's decision not to testify

The trial court did not violate defendant's privilege against self-incrimination in a capital trial by its instruction that defendant's decision not to testify "creates into presumption against him" rather than the phrase found in the pattern jury instructions of "creates no presumption against him," because: (1) defendant failed to properly preserve this issue for appellate review since he did not object to this instruction at trial; (2) even if this issue was preserved, the alleged error was a misstatement rather than an omission, in light of the fact that the trial court went on to state that defendant's silence was not to influence the jury's decision in any way; and (3) the instruction taken in context and as a whole conveyed the correct legal standard to the jury and does not constitute plain error.

### 3. Sentencing— capital—mitigating circumstance—defendant has family and friends who support him

The trial court did not err during a capital sentencing proceeding by excluding testimony from defendant's friend as to the impact defendant's death would have on the friend in an effort to

show the mitigating circumstance that defendant has family and friends who support him, because a third party's feelings are irrelevant to the capital sentencing proceeding.

**4. Sentencing— capital—mitigating circumstance—defendant had adjusted and could adjust to a lifetime of incarceration**

The trial court did not err during a capital sentencing proceeding by excluding testimony from defendant's father regarding a conversation the father had with defendant during defendant's pretrial incarceration to show the mitigating circumstance that defendant had adjusted and could adjust to a lifetime of incarceration, because: (1) defendant failed to properly preserve this issue for appellate review since he made no offer of proof to show the content of the excluded conversation as required by N.C.G.S. § 8C-1, Rule 103(a)(2); and (2) even if the issue was properly preserved, any error was harmless beyond a reasonable doubt when the substance of the excluded conversation, that defendant's father believed his son would turn his life over to the Lord, did come before the jury.

**5. Sentencing— capital—aggravating circumstance—murder committed to avoid or prevent lawful arrest**

The trial court did not err during a capital sentencing proceeding by submitting the N.C.G.S. § 15A-2000(e)(4) aggravating circumstance that the murder was committed for the purpose of avoiding or preventing a lawful arrest because defendant's statement to a co-worker, that the victim won't be able to tell who robbed the store based on the fact that defendant was going to kill the victim, could lead a reasonable jury to find that one purpose in killing the victim was to avoid apprehension.

**6. Criminal Law— prosecutor's argument—funeral services for the victim—victim's sons prayed for forgiveness of defendant**

The trial court did not abuse its discretion by failing to intervene ex mero motu in a capital trial when the prosecutor commented during closing arguments on the funeral services for the victim and described how the victim's sons prayed for forgiveness for defendant, because even though the prosecutor traveled outside the record, taken in context the reference was made to illustrate to the jury the necessity for it to follow the law and to leave forgiveness to a higher power.

**7. Criminal Law— prosecutor's argument—reference to one side of defendant's face as a monster**

The trial court did not abuse its discretion by failing to intervene ex mero motu in a capital trial when the prosecutor stated during closing arguments that defendant was a one-eyed Jack with one side of his face that he showed to his friends and family versus the other side that he showed to the victim, because: (1) the prosecution's reference to one side of defendant's face as a monster was made to show the two sides of defendant's character; and (2) the prosecutor did not directly call defendant a monster, but simply compared the hidden side of defendant's character to that of a monster.

**8. Criminal Law— prosecutor's argument—mischaracterization of evidence—trial court's warning sufficient**

The trial court did not abuse its discretion by failing to intervene ex mero motu in a capital trial when the prosecutor stated during closing arguments that defendant had gotten a teenager involved in drugs when the evidence showed only that the teenager sold drugs for defendant and owed money to defendant for drugs, because: (1) the trial court sustained defendant's objection to this statement and admonished the jury to take the evidence as the jury recalled it; (2) the trial court's warning was sufficient to cure any mischaracterization of the evidence by the prosecution; and (3) jurors are presumed to follow the trial court's instructions.

**9. Sentencing— capital—death penalty not disproportionate**

The trial court did not err by imposing the death sentence because: (1) defendant was convicted of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule; (2) defendant committed this crime while on pretrial release pending a separate murder trial; (3) the jury found the N.C.G.S. § 15A-2000(e)(2) aggravating circumstance that defendant had been previously convicted of another capital felony; (4) the jury found the N.C.G.S. § 15A-2000(e)(4) aggravating circumstance that defendant committed the murder for the purpose of avoiding a lawful arrest; and (5) the jury found the N.C.G.S. § 15A-2000(e)(5) aggravating circumstance that defendant was engaged in the commission of robbery with a firearm.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Bridges, J., on 18 December 1998 in Superior Court, Mecklenburg County, upon a jury verdict finding defendant guilty of first-degree murder. On 10 April 2000, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of an additional judgment. Heard in the Supreme Court 13 September 2000.

*Michael F. Easley, Attorney General, by Robert C. Montgomery, Assistant Attorney General, for the State.*

*Burton Craige for defendant-appellant.*

PARKER, Justice.

Defendant Melvin James Hardy, Jr., was indicted for the first-degree murder of Andrew Ray and for robbery with a dangerous weapon. Defendant was tried capitally and found guilty of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. He was also found guilty of robbery with a dangerous weapon. Following a capital sentencing proceeding, the jury recommended a sentence of death for the murder conviction; and the trial court entered judgment accordingly. The trial court also sentenced defendant to a term of 146 to 185 months' imprisonment for defendant's conviction of robbery with a dangerous weapon.

The State's evidence tended to show that defendant was an employee of the Hardee's restaurant where the victim was an assistant manager. On 19 March 1997 defendant gave his friend Essa Davidson a duffel bag containing a shotgun and a Bojangle's uniform. Defendant told Davidson to come to the restaurant that evening with the duffel bag and wearing the uniform. While working at the restaurant later that night, defendant had a telephone conversation with Martha Nicole Morris, a co-worker, during which he told her that he planned to rob the restaurant and that the victim would not "be able to tell it" because defendant was "going to kill him."

Around 9:45 p.m. Davidson arrived at the restaurant in the uniform and carrying the duffel bag containing the shotgun. Defendant took the bag from Davidson and went to the kitchen. Defendant then walked the victim into his office at gunpoint and ordered the victim to open the safe. Shortly thereafter, Davidson and two other employees, Patricia Robinson and J.T. Sturdivant, heard a gunshot. Davidson

then saw defendant holding the shotgun while standing over the victim, who was lying on the floor with his legs twitching.

Defendant came out of the office and told Davidson, Robinson, and Sturdivant to gather the money and clean up. Defendant asked Robinson how much money she wanted. Robinson initially refused to take any money, but then agreed to take two hundred dollars. Defendant told Robinson to mop, but she could not do so after seeing the victim's feet in a pool of blood on the floor.

Defendant told the others to act as if it were an ordinary day by cleaning up and clocking out as usual and told Robinson and Sturdivant to say that the victim was alive when they left. Defendant, Sturdivant, and Davidson then divided the remaining money, approximately $1,600. Defendant, Sturdivant, and Robinson left; and Davidson remained behind to find out the bus schedule.

Davidson could not find a bus schedule, so he went across the street to a Harris-Teeter grocery store to call a cab from the pay phone. Davidson was carrying the blue duffel bag with him at this time. A security guard from the grocery store spoke with Davidson and told him that he could use the store phone. Davidson and the guard then went inside the store.

During this time, the victim's wife, Elichia Ray, had arrived at the Hardee's to drive the victim home. Ray became concerned when the victim did not come out of the restaurant and called the district manager to come check inside the store. The district manager called the general manager, Martin Green, and asked him to go to the store. Once Green arrived, he and Ray went inside the store and discovered the victim's body. Green took Ray out to the parking lot and had to restrain her, as she was screaming and trying to go back inside the store.

Davidson and the guard noticed Ray screaming, with Green restraining her, in the Hardee's parking lot. The guard called the police from a phone inside the grocery store, then went to help Ray. The police arrived; and the guard told them what was happening, then returned to the grocery store. At that point Davidson was sitting down inside the grocery store. The guard asked Davidson if he had seen anything earlier at the Hardee's, and Davidson responded that he had not. Davidson left the store, carrying the blue duffel bag. The guard then returned to the Hardee's parking lot and described Davidson and the duffel bag he was carrying to the officers.

STATE v. HARDY

[353 N.C. 122 (2000)]

The guard rode with the officers and located Davidson walking down the street. Davidson was no longer carrying the duffel bag. The officers picked up Davidson, who then led them to the duffel bag, which he had hidden near the Harris-Teeter. Among the items in the duffel bag were a shotgun, a paper bag containing coins, and two shirts bearing Hardee's restaurant logos. The officers took Davidson to the police station, where he eventually told them what happened. Police later determined that a live shell found in the shotgun was the same type and brand as a shell casing and pellets found at the crime scene. Furthermore, tests confirmed that the shell found at the crime scene had been fired from the shotgun.

The pathologist who performed the autopsy on the victim found that the victim suffered a close-range shotgun wound to the head inflicted at an angle consistent with the victim kneeling or sitting. The pathologist opined that the victim died within five to ten minutes after the shooting as a result of brain damage and blood loss.

Prior to this incident, on 12 June 1995, defendant and Davidson drove sixteen-year-old Kedrin Bradley to Reedy Creek Park, telling her they were going to a church picnic. Once there, defendant told Bradley to leave her beeper and jewelry in the car and to go for a walk with them. After about ten minutes walking on the trail, defendant told Bradley he was robbing her. He pulled out a bandana, placed it around her neck, and began choking her. Defendant then dragged Bradley into the woods and beat her with a stick. Bradley died as a result of the attack. Defendant and Davidson were charged with Bradley's murder on 6 December 1995. At the time of the killing of the victim in this case, both defendant and Davidson were on pretrial release for the killing of Bradley. Defendant was convicted for Bradley's murder on 11 June 1998, prior to the trial of this case.

Additional facts will be presented as necessary to discuss specific issues.

**JURY SELECTION**

[1] Defendant first contends that the trial court erred in overruling defendant's objection to the State's impermissible use of a peremptory challenge to strike from the jury a black prospective juror, William Carter, solely on account of his race. Article I, Section 26 of the Constitution of North Carolina prohibits the use of peremptory challenges for racially discriminatory reasons, *see State v. Fletcher*, 348 N.C. 292, 312, 500 S.E.2d 668, 680 (1998), *cert. denied*, 525 U.S.

1180, 143 L. Ed. 2d 113 (1999), as does the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, *see Batson v. Kentucky*, 476 U.S. 79, 89, 90 L. Ed. 2d 69, 83 (1986).

In *Batson* the United States Supreme Court established a three-part test to determine if the prosecutor has engaged in impermissible racial discrimination in the selection of jurors. *See Hernandez v. New York*, 500 U.S. 352, 358, 114 L. Ed. 2d 395, 405 (1991) (citing *Batson*, 476 U.S. at 96-98, 90 L. Ed. 2d at 87-89). First, the defendant must establish a *prima facie* case that the State has exercised a peremptory challenge on the basis of race. *See id.*

Second, once the *prima facie* case has been established by the defendant, the burden shifts to the State to rebut the inference of discrimination by offering a race-neutral explanation for attempting to strike the juror in question. *See id.* at 358-59, 114 L. Ed. 2d at 405; *see also State v. Gaines*, 345 N.C. 647, 668, 483 S.E.2d 396, 408, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997). The explanation must be clear and reasonably specific, but " 'need not rise to the level justifying exercise of a challenge for cause.' " *State v. Porter*, 326 N.C. 489, 498, 391 S.E.2d 144, 151 (1990) (quoting *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88). The prosecutor is not required to provide a race-neutral reason that is persuasive or even plausible. *See Fletcher*, 348 N.C. at 313, 500 S.E.2d at 680. The issue at this stage is the facial validity of the prosecutor's explanation; and unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed race-neutral. *See State v. Barnes*, 345 N.C. 184, 209-10, 481 S.E.2d 44, 57, *cert. denied*, 522 U.S. 876, 139 L. Ed. 2d 134 (1997), *and cert. denied*, 523 U.S. 1024, 140 L. Ed. 2d 473 (1998). Our courts also permit the defendant to introduce evidence at this point that the prosecutor's explanations are merely a pretext. *See Gaines*, 345 N.C. at 668, 483 S.E.2d at 408.

Third, and finally, the trial court must make the ultimate determination as to whether the defendant has carried his burden of proving purposeful discrimination. *See Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 405; *Fletcher*, 348 N.C. at 313, 500 S.E.2d at 680. As this determination is essentially a question of fact, the trial court's decision as to whether the prosecutor had a discriminatory intent is to be given great deference and will be upheld unless the appellate court is convinced that the trial court's determination is clearly erroneous. *See Fletcher*, 348 N.C. at 313, 500 S.E.2d at 680; *State v. Kandies*, 342 N.C. 419, 434-35, 467 S.E.2d 67, 75, *cert. denied*, 519 U.S. 894, 136 L. Ed. 2d 167 (1996). " 'Where there are two permissible views of the

STATE v. HARDY

[353 N.C. 122 (2000)]

evidence, the factfinder's choice between them cannot be clearly erroneous.' " *State v. Thomas*, 329 N.C. 423, 433, 407 S.E.2d 141, 148 (1991) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 84 L. Ed. 2d 518, 528 (1985)).

With respect to prospective juror Carter, the trial court found that defendant made a *prima facie* showing of potential purposeful racial discrimination. The prosecutor then gave race-neutral explanations for the challenge, including the prospective juror's limited education, his limited ability to read and write, his failure to answer all questions on the juror questionnaire, his statement that he had never considered his views on the death penalty until that day, and the prosecutor's impression that the juror may be "out of touch with reality." The trial court concluded that the peremptory strike of prospective juror Carter was without racially discriminatory intent.

Defendant contends that the prosecutor's proffered explanations were clearly a pretext in that the prosecutor focused on prospective juror Carter's ability to comprehend the evidence despite the lack of significant scientific or complex evidence in this case. We disagree. We again note that a prosecutor's explanations for a peremptory strike " 'need not rise to the level justifying exercise of a challenge for cause.' " *Porter*, 326 N.C. at 498, 391 S.E.2d at 151 (quoting *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88). Therefore, the prosecution is not required to show that prospective juror Carter could not understand the evidence, so long as the trial court believes that the race-neutral explanation is the prosecution's true motivation in exercising the challenge. Furthermore, we note that defendant proffered no rebuttal at trial to show that any explanation given by the prosecution was a pretext. *See id.* at 501, 391 S.E.2d at 152 (noting that defense counsel was apparently satisfied by the explanations offered by the prosecutor since defendant did not attempt to demonstrate that the explanations were merely a pretext); *Gaines*, 345 N.C. at 669, 483 S.E.2d at 409 (same).

We have reviewed the transcript and conclude that the explanations offered by the prosecution are supported in the record and are race-neutral reasons for exercising a peremptory challenge. *See, e.g., State v. Carter*, 338 N.C. 569, 587, 451 S.E.2d 157, 166 (1994) (holding that peremptory challenge based on incomplete answers to juror questionnaire was race-neutral), *cert. denied*, 515 U.S. 1107, 132 L. Ed. 2d 263 (1995); *State v. Robinson*, 336 N.C. 78, 96, 443 S.E.2d

306, 314 (1994) (holding that peremptory challenge based on prospective juror's inattention to detail and possible inability to retain evidence at trial was race-neutral), *cert. denied,* 513 U.S. 1089, 130 L. Ed. 2d 650 (1995); *Thomas,* 329 N.C. at 430-32, 407 S.E.2d at 146-47 (holding that peremptory challenge on basis that juror had never considered death penalty before was race-neutral). The trial court's determination that there was no purposeful discrimination in the challenge of prospective juror Carter is not clearly erroneous. This assignment of error is overruled.

## GUILT-INNOCENCE PHASE

[2] In his only argument pertaining to the guilt-innocence phase of his trial, defendant contends that the trial court violated his constitutional privilege against self-incrimination by erroneously instructing the jury regarding defendant's decision not to testify.

Both the Fifth Amendment to the United States Constitution and Article I, Section 23 of the North Carolina Constitution establish a privilege against self-incrimination. This Court has held that a trial court must, upon request, " 'minimize the danger that the jury will give evidentiary weight to a defendant's failure to testify' by giving an appropriate instruction." *State v. Ross,* 322 N.C. 261, 265, 367 S.E.2d 889, 892 (1988) (quoting *Carter v. Kentucky,* 450 U.S. 288, 305, 67 L. Ed. 2d 241, 254 (1981)).

Addressing defendant's failure to testify, the trial court in this case instructed the jury as follows:

Now, the defendant in this case has not testified.

The law of North Carolina, indeed the Constitution of this State as well as the Constitution of the United States, affords him this privilege.

These same laws also assures [sic] this defendant . . . that his decision not to testify creates into presumption against him and therefore his silence in this case is not to influence your decision in any way.

Defendant argues that the trial court erred in using the phrase "creates into presumption against him," rather than the phrase as found in the pattern jury instructions, "creates no presumption against him." *See* N.C.P.I.—Crim. 101.30 (1974). Defendant contends the word "into" in this context implies that a presumption is created against defendant by virtue of his failure to testify in his own defense.

We begin by noting that defendant did not object to the instruction at trial and, thus, failed to properly preserve this issue for appellate review.

> A party may not assign as error any portion of the jury charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict . . .; provided, that opportunity was given to the party to make the objection out of the hearing of the jury, and, on request of any party, out of the presence of the jury.

N.C. R. App. P. 10(b)(2); *see also Ross*, 322 N.C. at 265, 367 S.E.2d at 891; *State v. Morgan*, 315 N.C. 626, 644-46, 340 S.E.2d 84, 95-96 (1986).

Defendant in this case had ample opportunity to object to the instruction outside the presence of the jury. After excusing the jury to the deliberation room, the trial court asked, "Prior to sending back the verdict sheets does the State wish to point out any errors or omissions from the charge?" The trial court then asked the same of defendant, and defendant responded with respect to other issues but did not object to the instruction in question. Though there is an exception to this rule where a requested instruction is omitted, *see Ross*, 322 N.C. at 265, 367 S.E.2d at 891, the alleged error here was a misstatement rather than an omission. As defendant failed to preserve this issue by objecting during trial, we will review the record to determine if the instruction constituted plain error. *See State v. Cummings*, 326 N.C. 298, 315, 389 S.E.2d 66, 75 (1990); *Morgan*, 315 N.C. at 644, 340 S.E.2d at 95.

Under a plain error analysis, defendant is entitled to a new trial only if the error was so fundamental that, absent the error, the jury probably would have reached a different result. *See State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993). "[E]ven when the 'plain error' rule is applied, '[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.' " *State v. Odom*, 307 N.C. 655, 660-61, 300 S.E.2d 375, 378 (1983) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154, 52 L. Ed. 2d 203, 212 (1977)), *quoted in State v. Anderson*, 350 N.C. 152, 177, 513 S.E.2d 296, 311, *cert. denied*, —— U.S. ——, 145 L. Ed. 2d 326 (1999). Furthermore, in reviewing jury instructions this Court has stated:

> " 'The charge of the court must be read as a whole . . . , in the same connected way that the judge is supposed to have intended

it and the jury to have considered it . . . .' *State v. Wilson*, 176 N.C. 751, [754-55,] 97 S.E. 496[, 497] (1918). It will be construed contextually, and isolated portions will not be held prejudicial when the charge as [a] whole is correct. If the charge presents the law fairly and clearly to the jury, the fact that some expressions, standing alone, might be considered erroneous will afford no ground for reversal."

*State v. Rich*, 351 N.C. 386, 393-94, 527 S.E.2d 299, 303 (2000) (quoting *State v. Lee*, 277 N.C. 205, 214, 176 S.E.2d 765, 770 (1970)) (alterations in original).

Defendant contends that the phrase "creates into presumption against him" could have led the jury to incorrectly understand that defendant's silence creates a presumption against him. However, the record shows that the trial court immediately went on to state, "therefore his silence in this case is not to influence your decision in any way." Use of the word "no" rather than "into" would not have led the jury to reach a different result in this case, given the context of the misstatement and the language immediately surrounding it. This Court will not construe isolated expressions in a charge out of context to infer prejudice to a defendant. *See State v. Jones*, 294 N.C. 642, 653, 243 S.E.2d 118, 125 (1978). We conclude that this instruction, when taken in context and as a whole, conveyed the correct legal standard to the jury and does not constitute plain error. Therefore, this assignment of error is overruled.

## SENTENCING PROCEEDING

[3] Defendant next contends that the trial court erred during the sentencing proceeding by excluding testimony from defendant's friend Fred Walker as to the impact defendant's death would have on Walker. Defendant asserts this violated his right to present a complete defense, including evidence of mitigating circumstances, under the Sixth Amendment to the United States Constitution and Article I, Section 23 of the North Carolina Constitution.

A capital defendant must be permitted to present any aspect of the defendant's character, record, or any other circumstance which a jury could deem to have mitigating value. *See Lockett v. Ohio*, 438 U.S. 586, 604, 57 L. Ed.2d 973, 990 (1978); *State v. Locklear*, 349 N.C. 118, 160-61, 505 S.E.2d 277, 302 (1998), *cert. denied*, 526 U.S. 1075, 143 L. Ed. 2d 559 (1999). This Court has further explained that "[t]he feelings, actions, and conduct of third parties have no mitigating

value as to defendant and, therefore, are irrelevant to a capital sentencing proceeding." *Locklear*, 349 N.C. at 161, 505 S.E.2d at 302.

The trial court sustained the prosecutor's objection to the following question posed to Walker during the sentencing proceeding: "How do you feel about the possibility of losing [defendant]?" Defendant asserts that this testimony would have supported one of the mitigating circumstances submitted to the jury—that "defendant has family and friends who support him"—by showing the degree of attachment between defendant and Walker.

However, that mitigating circumstance and Walker's answer to this question, deal with a third party's feelings and are, therefore, irrelevant to the capital sentencing proceeding. We considered a similar mitigating circumstance in *Locklear. Locklear*, 349 N.C. at 160, 505 S.E.2d at 302 (finding no error where the trial court refused to submit the nonstatutory mitigating circumstance that "defendant continues to have family members, such as his mother, brother, aunts, and uncles, who care for and support him"). Therefore, we conclude that the trial court did not err in excluding this testimony.

[4] Next, defendant argues that the trial court similarly erred by refusing to allow defendant's father to testify during the sentencing proceeding regarding a conversation he had with defendant during defendant's pretrial incarceration. The following exchange occurred between defendant's counsel and defendant's father:

Q. Do you feel that your son has been saved or if not can be saved?

A. He hasn't been saved. I feel that he can. He just needs to turn his life over to the Lord. I don't think he's done that.

Q. But you believe he can do that?

A. I believe he can do that.

Q. Do you believe he will do that?

A. I believe he will do that. I was talking with him this past Sunday. He called the church. And I finally got the phone and it was him on the phone. I was talking with him, and I kind of went back and forth over all the things that we're all faced with because I feel there are a lot of victims here. I was just talking with him and he said, "dad"—

[PROSECUTOR]: OBJECTION to what he said.

THE COURT: SUSTAINED.

Q. Based on that conversation you feel given the opportunity he will be saved?

[PROSECUTOR]: OBJECTION; repetitious.

THE COURT: OVERRULED.

Q. You can answer that.

A. I believe he will.

The trial court sustained the prosecutor's objection on hearsay grounds. We initially note that the Rules of Evidence do not apply to sentencing proceedings. *See* N.C.G.S. § 15A-2000(a)(3) (1999); N.C.G.S. § 8C-1, Rule 1101(b)(3) (1999); *see also State v. Gray*, 347 N.C. 143, 172, 491 S.E.2d 538, 550 (1997) (relevant evidence should not ordinarily be excluded under the Rules of Evidence during a capital sentencing proceeding), *cert. denied*, 523 U.S. 1031, 140 L. Ed. 2d 486 (1998).

Defendant argues that the conversation would have supported the mitigating circumstance submitted to the jury that "[d]efendant has adjusted and could adjust to a lifetime of incarceration." However, inasmuch as defendant made no offer of proof to show the content of the excluded conversation, this Court is precluded from evaluating the import of the excluded evidence. By failing to make an offer of proof, defendant has failed to properly preserve this issue for appellate review, pursuant to N.C.G.S. § 8C-1, Rule 103(a)(2). Furthermore, even if the issue were properly preserved, any error here would be harmless beyond a reasonable doubt. The record shows that defendant's father did, in fact, answer the question asked by stating his belief that his son would turn his life over to the Lord. Therefore, the substance of the excluded conversation, as argued by defendant on appeal, did come before the jury. *See State v. Hightower*, 340 N.C. 735, 745, 459 S.E.2d 739, 745 (1995). We overrule this assignment of error.

[5] Defendant next assigns error to the trial court's submission of the (e)(4) aggravating circumstance, that the murder was committed for the purpose of avoiding or preventing a lawful arrest. *See* N.C.G.S. § 15A-2000(e)(4). Defendant contends that this aggravating circumstance was not supported by the evidence, as the evidence showed he was motivated solely by resentment and dislike towards the vic-

STATE v. HARDY

[353 N.C. 122 (2000)]

tim, not by a desire to avoid apprehension for the robbery. We disagree.

Before the trial court may instruct the jury on the (e)(4) aggravating circumstance, it must find substantial, competent evidence in the record from which the jury can infer that at least one of defendant's purposes for the killing was the desire to avoid subsequent detection and apprehension for a crime. *See State v. Wilkinson*, 344 N.C. 198, 224-25, 474 S.E.2d 375, 389 (1996); *State v. Oliver*, 309 N.C. 326, 350, 307 S.E.2d 304, 320 (1983); *State v. Goodman*, 298 N.C. 1, 27, 257 S.E.2d 569, 586 (1979).

In this case the record contains substantial evidence that defendant was motivated by a desire to avoid subsequent detection and apprehension for the robbery he had just committed. Defendant's co-worker Martha Nicole Morris testified as follows regarding a telephone conversation she had with defendant the day of the killing:

He was talking about he was going to rob Hardee's. And I was like you're going to rob the place you work? He was like yeah. I was like how are you going to rob the place you work? They are you [sic] going to know who done it. I was like you all going to be wearing a mask or something? He was like, no. He was like he won't be able to tell it. He was speaking of [the victim]. I was like why not. He was like I'm going to kill him. And when he said that he was going to kill him I was like you're going to kill Andrew. He was like, yeah. I was like you can't just go rob Hardee's, you have got to kill this man? He was like, yeah. He was like he got to go, he got to go. I was like, well, I don't want to hear it, and I hung up.

We conclude that the jury could reasonably infer from the above statement that defendant was motivated, at least in part, by a desire to avoid apprehension. Defendant's comment that "[the victim] won't be able to tell it" because "I'm going to kill him" could certainly lead a reasonable jury to find that one purpose in killing the victim was to avoid apprehension. This testimony constituted sufficient, substantial evidence to support submission of this aggravating circumstance, and we find no error in the trial court's decision to submit it to the jury.

Defendant next contends that the trial court denied defendant's constitutional right to due process and to a fair trial by permitting the prosecutor to make three grossly improper statements during closing argument.

Closing arguments are left largely to the discretion of the trial court, though counsel cannot argue facts that are not supported by the evidence. *See State v. Fullwood*, 343 N.C. 725, 740, 472 S.E.2d 883, 891 (1996), *cert. denied*, 520 U.S. 1122, 137 L. Ed. 2d 339 (1997). However, "[w]hen a defendant fails to object to an allegedly improper closing argument, the standard of review is whether the argument was so grossly improper that the trial court erred in failing to intervene *ex mero motu*." *State v. Roseboro*, 351 N.C. 536, 546, 528 S.E.2d 1, 8 (2000). Furthermore, " '[t]he impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it.' " *State v. Hipps*, 348 N.C. 377, 411, 501 S.E.2d 625, 645 (1998) (quoting *State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979)), *cert. denied*, 525 U.S. 1180, 143 L. Ed. 2d 114 (1999).

**[6]** Defendant first argues that the trial court erred by permitting the prosecutor to comment on the funeral services for the victim and to describe how the victim's sons prayed for forgiveness for defendant, though no evidence was introduced at trial to support this argument. Defendant did not object to these statements at trial. While the prosecutor traveled outside the record by referring to the victim's funeral and the sons' prayers, taken in context, this reference was made to illustrate to the jury the necessity for it to follow the law and to leave forgiveness to a higher power. The prosecutor further stated:

Melvin James Hardy can be forgiven. All he has to do is ask and it will be given to him.

But that kind of forgiveness is going to have to come from a power far, far higher than this Court.

You, ladies and gentlemen, have a duty, taken an oath, to decide based on the evidence and the law in this case the appropriate punishment.

. . . .

What this is about here today is to decide what the law and what the evidence tell[ ] you, the jury, . . . the appropriate sentence is.

. . . .

You're still human beings. And you still have the capacity for pity and sympathy, but that's not the factors upon which you make your decision.

The objectionable statements were a passing reference to focus the jury's attention on its duty. In comparison to the prosecutor's entire closing argument, the comments were minor. Thus considered, the mention of the funeral and the sons' participation, though perhaps moving, could not have prejudiced defendant. We conclude, therefore, that the prosecutor's statements regarding the funeral were not so improper that the trial court erred in not intervening *ex mero motu*.

**[7]** Defendant next argues that the following statement by the prosecutor was grossly improper:

[Defendant] is a one-eyed Jack. You know what a one-eyed Jack is? You see one side of the face. That's the side that these people that come up here have seen.

The other side of his face is more horrible than even those pictures, what he did to his victims [sic].

Other side of his face is a monster. A monster.

Defendant did not object to this statement at trial. Again, we hold that the trial court did not abuse its discretion by failing to intervene *ex mero motu* during this portion of the prosecutor's closing argument. In previous cases, we have held that similar references do not warrant *ex mero motu* intervention by the trial court. *See, e.g., State v. Walls*, 342 N.C. 1, 63-64, 463 S.E.2d 738, 772 (1995) (referring to the defendant as "that devil" and comparing him to movie villains "Jason" and "Freddie Kruger"), *cert. denied*, 517 U.S. 1197, 134 L. Ed. 2d 794 (1996); *State v. Wilson*, 338 N.C. 244, 259-60, 449 S.E.2d 391, 400-01 (1994) (comparing the defendant to Hitler); *State v. Hamlet*, 312 N.C. 162, 173, 321 S.E.2d 837, 845 (1984) (referring to the defendant as an "animal").

The prosecution's reference to one side of defendant's face as a monster was made to show the two sides of defendant's character: the one he showed to his family and friends, and the other one he showed to the victim. The prosecutor did not directly call defendant a monster, but simply compared the hidden side of defendant's character to that of a monster. While we do not condone referring to any

defendant as a "monster," we decline to hold that the reference here rose to a level that required intervention by the trial court.

[8] Finally, the prosecutor stated in closing argument that defendant had gotten a teenager, Kedrin Bradley, involved in drugs. However, the evidence at trial showed only that Bradley sold drugs for defendant and owed money to defendant for drugs, not that defendant had gotten her involved in drugs. The trial court sustained defendant's objection to this statement and admonished the jury, "Members of the jury, again take the evidence as you recall it to be."

Once an objection is sustained, the trial court has a duty to "censor remarks not warranted by either the evidence or the law." *State v. Monk*, 286 N.C. 509, 516, 212 S.E.2d 125, 131 (1975); *accord State v. Sanderson*, 336 N.C. 1, 15, 442 S.E.2d 33, 42 (1994). Defendant contends that the trial court's curative instruction was not adequate to censor the prosecutor's misstatement of the evidence. We disagree. By sustaining the objection and admonishing the jurors to take the evidence as they recalled it, the trial court sent a clear signal that the prosecutor had misstated the evidence. Accordingly, we conclude that the trial court's warning in this instance was sufficient to cure any mischaracterization of the evidence by the prosecution. Jurors are presumed to follow the trial court's instructions, *see State v. McNeil*, 350 N.C. 657, 689, 518 S.E.2d 486, 505 (1999), *cert. denied*, —— U.S. ——, 146 L. Ed. 2d 321 (2000); therefore, a stronger or more thorough admonishment was not required. This assignment of error is overruled.

## PRESERVATION ISSUES

Defendant raises nine additional issues that he concedes have been decided contrary to his position previously by this Court: (i) the trial court lacked jurisdiction to try or impose judgment on defendant for first-degree murder because the short-form murder indictment did not allege all the elements of first-degree murder; (ii) the trial court violated defendant's constitutional right to be present at every stage of his capital trial by permitting the oath to be administered to the jurors when neither defendant nor his counsel was present; (iii) the trial court erred in instructing the jury that a person acting in concert with another "is guilty of any other crime committed by the other in pursuance of the common purpose to commit that original crime or [that] is a natural or probable consequence thereof"; (iv) the trial court erred in submitting aggravating circumstance N.C.G.S.

§ 15A-2000(e)(2) for the reason that defendant had only been charged with but had not been convicted of a capital felony at the time he committed the murder for which he was on trial; (v) the trial court erred in instructing the jury that each juror "may" consider mitigating circumstances; (vi) the trial court erred in using the inherently ambiguous and vague terms "satisfaction" and "satisfy" in defining the burden of proof applicable to mitigating circumstances; (vii) the trial court erred in instructing that the jurors were required to determine whether nonstatutory mitigating circumstances had mitigating value; (viii) the trial court erred in instructing the jury that in deciding Issue Three a juror may consider any mitigating circumstance or circumstances that "the juror" determined to exist by a preponderance of the evidence in Issue Two; (ix) the trial court erred in sentencing defendant to death because the death penalty is inherently cruel and unusual, and the North Carolina capital sentencing scheme is unconstitutionally vague and overbroad.

Defendant raises these issues for purposes of urging this Court to reexamine its prior holdings and also for the purpose of preserving the issues for any possible further judicial review. We have considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. We overrule these assignments of error.

## PROPORTIONALITY

**[9]** Finally, this Court exclusively has the statutory duty in capital cases, pursuant to N.C.G.S. § 15A-2000(d)(2), to review the record and determine (i) whether the record supports the jury's findings of the aggravating circumstances upon which the court based its death sentence; (ii) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (iii) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *See State v. McCollum*, 334 N.C. 208, 239, 433 S.E.2d 144, 161 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994).

After a thorough review of the transcript, record on appeal, briefs, and oral arguments of counsel, we are convinced that the jury's findings of the three aggravating circumstances submitted were supported by the evidence. We also conclude that nothing in the record suggests that defendant's death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

Finally, we must consider whether the imposition of the death penalty in defendant's case is proportionate to other cases in which the death penalty has been affirmed, considering both the crime and the defendant. *See Robinson*, 336 N.C. at 133, 443 S.E.2d at 334. The purpose of proportionality review is "to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Proportionality review also acts "[a]s a check against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). Our consideration is limited to those cases which are roughly similar as to the crime and the defendant, but we are not bound to cite every case used for comparison. *See State v. Syriani*, 333 N.C. 350, 400, 428 S.E.2d 118, 146, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994).

Defendant was convicted of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. Defendant was also convicted of robbery with a dangerous weapon. The jury found all three aggravating circumstances submitted: (i) that defendant had been previously convicted of another capital felony, N.C.G.S. § 15A-2000(e)(2); (ii) that defendant committed the murder for the purpose of avoiding a lawful arrest, N.C.G.S. § 15A-2000(e)(4); and (iii) that the murder was committed while defendant was engaged in the commission of robbery with a firearm, N.C.G.S. § 15A-2000(e)(5).

The trial court submitted two statutory mitigating circumstances for the jury's consideration: (i) defendant "was 19 years old at the time of the commission of this offense," N.C.G.S. § 15A-2000(f)(7); and (ii) the catchall mitigating circumstance that there existed any other circumstance arising from the evidence which the jury deemed to have mitigating value, N.C.G.S. § 15A-2000(f)(9). The jury found only the age mitigator to exist. The trial court also submitted ten nonstatutory mitigating circumstances; the jury found none of these to exist.

We begin our proportionality analysis by comparing this case to those cases in which this Court has determined the sentence of death to be disproportionate. This Court has determined the death sentence

to be disproportionate on seven occasions. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by Gaines*, 345 N.C. 647, 483 S.E.2d 396, *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). This case is not substantially similar to any of the cases in which this Court has found that the death sentence was disproportionate.

The present case has several features that distinguish it from the cases in which we have found the sentence to be disproportionate. First, the jury convicted defendant on the basis of premeditation and deliberation and under the felony murder rule. "The finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *quoted in State v. Braxton*, 352 N.C. 158, 226, 531 S.E.2d 428, 467 (2000). Second, defendant committed this crime while on pretrial release pending a separate murder trial. Though a defendant on pretrial release is still presumed to be innocent, he is in a special position and should be especially cautious about committing another criminal offense. Whether or not he is guilty of the first crime, such a defendant demonstrates a disdain for the law by committing another offense while on pretrial release. *See State v. Webb*, 309 N.C. 549, 559, 308 S.E.2d 252, 257 (1983). Finally, in none of those cases were three aggravating circumstances found. Here, the jury found that the (e)(2), (e)(4), and (e)(5) aggravating circumstances existed. Therefore, we conclude that the present case is distinguishable from those cases in which we have found the death penalty disproportionate.

We also consider cases in which this Court has found the death penalty to be proportionate. This Court has deemed the (e)(5) aggravating circumstance, standing alone, to be sufficient to sustain a sentence of death, *see State v. Lawrence*, 352 N.C. 1, 36, 530 S.E.2d 807, 829 (2000), and has never found a death sentence to be disproportionate where either the (e)(2) or (e)(4) aggravating circumstance was found to exist, *see State v. Braxton*, 352 N.C. 158, 531 S.E.2d 428 (N.C.G.S. § 15A-2000(e)(2)); *State v. Warren*, 348 N.C. 80, 499 S.E.2d 431 (N.C.G.S. § 15A-2000(e)(2)), *cert. denied*, 525 U.S. 915, 142 L. Ed. 2d 216 (1998); *State v. McCarver*, 341 N.C. 364, 407, 462 S.E.2d

25, 49 (1995) (N.C.G.S. § 15A-2000(e)(4)), *cert. denied*, 517 U.S. 1110, 134 L. Ed. 2d 482 (1996). Furthermore, we note that the (e)(2) aggravating circumstance reflects on defendant's character as a recidivist. *See State v. Cummings*, 323 N.C. 181, 197, 372 S.E.2d 541, 552 (1988), *sentence vacated on other grounds*, 494 U.S. 1021, 108 L. Ed. 2d 602 (1990). Viewed in this light, we conclude that the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence disproportionate or those in which juries have consistently returned recommendations of life imprisonment.

Defendant received a fair trial and capital sentencing proceeding, free from prejudicial error, and the death sentence in this case is not disproportionate. Accordingly, the judgments of the trial court are left undisturbed.

NO ERROR.