STATE OF NORTH CAROLINA v. TIMOTHY LIONELL WHITE

No. 4A01

(Filed 28 June 2002)

## 1. Sentencing— capital—Rule 403 balancing test

The trial court did not err in a capital sentencing proceeding by admitting evidence of defendant's satanic beliefs where defendant contended that the holding that the Rules of Evidence do not apply in capital sentencing proceedings is not consistent with N.C.G.S. § 15A-2000 and that the court would not have admitted this evidence under a proper balancing test. Any competent and relevant evidence which will substantially support the

imposition of the death penalty may be introduced at the capital sentencing stage and the Rule 403 balancing test is not required.

**2. Sentencing— capital—aggravating circumstances—especially heinous, atrocious, or cruel—defendant's satanic beliefs**

The trial court did not err in a capital sentencing proceeding by admitting evidence of defendant's satanic beliefs where the State requested submission of the especially heinous, atrocious, or cruel aggravating circumstance, N.C.G.S. § 15A-2000(e)(9). Defendant's statements that the murder was satanically motivated may show depravity of mind which may be considered in determining if the killing was especially heinous, atrocious, or cruel. Moreover, defendant himself solicited direct references to his satanic comments, the court limited the State to the portion of the evidence which showed a motive for the killing, and the failure of the jury to find the aggravator is some indication that the jury carefully considered the evidence and was not influenced by it.

**3. Sentencing— capital—defendant's fascination with movie—properly admitted**

The trial court did not err in a capital sentencing proceeding by allowing a detective to testify about statements from a man incarcerated with defendant (Nash) concerning defendant's fascination with the movie "Natural Born Killers." The detective's testimony corroborated Nash's testimony, and, as to statements related by the detective to which Nash did not testify, defendant lost the benefit of his earlier objection when others testified to the same effect without objection.

**4. Sentencing— capital—evidence that defendant "sick-minded"**

There was no prejudice in a capital sentencing proceeding where the State was allowed to elicit testimony from defendant's girlfriend that defendant was a "sick-minded person." Defendant presented substantial evidence that he suffered from severe psychological disturbance and the jury found the mental disturbance mitigator.

**5. Sentencing— capital—introduction of disputed evidence**

The trial court did not err in a capital sentencing proceeding by allowing the State to introduce a newspaper allegedly found on the victim's chest, even though the evidence was in conflict.

Whether and when the newspaper was placed on the victim's chest was for the jury to decide and, even if the State did not lay a proper foundation, defendant did not meet his burden of showing prejudice.

**6. Sentencing— capital—aggravating circumstances—armed robbery and pecuniary gain—not double counting**

The trial court did not err in a capital sentencing proceeding by submitting both the aggravating circumstance that the murder was committed while defendant was engaged in an armed robbery and the aggravating circumstance that the murder was committed for pecuniary gain. Independent evidence supported both circumstances; defendant's evidence demonstrated that he stole the victim's car for transportation and the theft of money from her purse supported the pecuniary gain circumstance. Moreover, the court properly limited the jury's consideration of the evidence supporting the circumstances.

**7. Sentencing— capital—aggravating circumstances—pecuniary gain—evidence of motive**

The evidence in a capital sentencing proceeding was sufficient to submit the pecuniary gain aggravating circumstance even though defendant contended that the evidence did not show that the killing was motivated by pecuniary gain. Given the conflict in the evidence and taking the evidence in the light most favorable to the State, the trial court properly left determination of defendant's motive to the jury.

**8. Sentencing— capital—testimony about defendant's family—not admissible**

The trial court did not err in a capital sentencing proceeding by excluding evidence from defendant's psychiatrist about the reaction of defendant's parents to his treatment and whether it was important to the psychiatrist to learn defendant's family history. The conduct of other family members did not relate to any aspect of defendant's character or record or to the circumstances of the offense and was not relevant to mitigation; moreover, defendant had the benefit of comments on the same subject from a different therapist when the witness answered before the court ruled on the objection and the State did not move to strike.

**9. Sentencing— capital—remorse**

There was no prejudicial error in a capital sentencing proceeding where the State asked a detective if she knew whether defendant had told the victim's grandson and daughter that he was sorry. Any error was harmless because the witness answered that she did not know.

**10. Sentencing— capital—aggravating circumstances—prior violent felony—juvenile tried as adult**

The trial court did not err in a capital sentencing proceeding by submitting the aggravating circumstance of a prior felony conviction involving violence where he had been tried as an adult when he was 16 for a felonious assault committed when he was 15. The age of the perpetrator is irrelevant if the previous conviction meets the criteria for an (e)(3) aggravating circumstance. N.C.G.S. § 15A-2000(e)(3).

**11. Evidence— sentencing—capital—autopsy and crime scene photos—admissible**

The trial court did not err in a capital sentencing proceeding by denying defendant's pretrial motion to exclude autopsy and crime scene photos which defendant contended were gruesome and inflammatory. Each of the photos represented different aspects of the victim and the autopsy, the number was not unduly repetitious, the photographs were not aimed merely at arousing the passions of the jury, and each had illustrative and probative value.

**12. Sentencing— capital—victim's memorial**

The trial court did not err in a capital sentencing proceeding by admitting a memorial cookbook dedicated to the victim where the evidence merely reflected the high regard in which the victim was held and was not unduly prejudicial. Nothing suggests that the jury based its decision solely on this evidence, and none of the aggravating circumstances derived from this evidence.

**13. Sentencing— capital—death penalty—not disproportionate**

A sentence of death imposed upon defendant for first-degree murder was not disproportionate where defendant entered the elderly victim's home, shot her in the chest, and stomped her head before leaving her to die; defendant pled guilty to first-degree murder; and the jury found the (e)(3) prior conviction of a violent felony and (e)(5) murder while engaged in the commis-

sion of an armed robbery aggravating circumstances, either of which, standing alone, is sufficient to sustain a sentence of death.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Albright, J., on 31 August 2000 in Superior Court, Forsyth County, upon defendant's plea of guilty of first-degree murder. Heard in the Supreme Court 12 March 2002.

*Roy Cooper, Attorney General, by Barry S. McNeill, Special Deputy Attorney General, for the State.*

*Dudley A. Witt for defendant-appellant.*

PARKER, Justice.

Defendant Timothy Lionell White was indicted on 25 October 1999 for the first-degree murder of Evvie Lane Vaughn. On 7 August 2000 defendant entered a plea of guilty to the charge of first-degree murder. After a capital sentencing proceeding, the jury recommended that defendant be sentenced to death; and the trial court entered judgment accordingly. For the reasons discussed herein, we conclude that defendant's capital sentencing proceeding was free from prejudicial error.

The State's evidence tended to show that defendant lived with his parents in a mobile home on Tobaccoville Road in Forsyth County, next door to the seventy-two-year-old victim, who was his great-aunt. On the morning of 21 July 1999, defendant took four guns from his father's gun cabinet. Shortly after removing the guns, defendant began to play with them in his bedroom. Defendant then put one of the weapons, a .22-caliber handgun, in his back pocket; walked next door; and when the victim opened the door, pointed the pistol at her. In response the victim threw up her arms, screamed, and reached for the gun. Defendant shot her in the chest. After the victim fell to the floor, defendant attempted to shoot her again; but his pistol jammed. Defendant then approached the victim and "stomp[ed] her in the head until he thought she was dead." Defendant removed approximately $100.00 and a set of car keys from the victim's pocketbook; started the victim's Cadillac, which was in the garage; and returned to his home to pack some clothes and the rest of the guns in a duffle type bag. He also wrote a note to his girlfriend acknowledging that he had done wrong. Defendant returned to the victim's home. After locking the doors from the inside, defendant exited through the garage. Defendant then drove to West Virginia in the victim's Cadillac.

**STATE v. WHITE**

[355 N.C. 696 (2002)]

Defendant rented a motel room at a motel near Charleston, West Virginia, and struck a conversation with a man, James "Lefty" Booker, staying in another room. During the course of that conversation defendant showed Lefty the guns and asked where he could get rid of them. Lefty took defendant to a house where defendant traded the guns for crack cocaine. Lefty later asked to borrow the Cadillac; defendant agreed; and Lefty left and did not return. Defendant then stole another vehicle in West Virginia and drove to New Orleans, where he was arrested on 25 July 1999 by New Orleans Police Department detectives. After an extradition hearing, defendant was returned to North Carolina.

Detective Elizabeth Culbreth of the Forsyth County Sheriff's Department interviewed defendant in New Orleans, and defendant confessed to the crime. Thereafter, defendant also made a written statement in which he again set forth the circumstances surrounding the killing. Defendant told Detective Culbreth that "he [had] always wanted to know what it would feel like to kill someone."

The victim's grandson James "Jay" Tutterow, nine years old at the time of the murder, lived nearby with his mother and father. On 22 July 1999 around 4:10 p.m., Jay rode his bicycle to see his grandmother. Jay entered the house through the open garage door and an open side door into the house. As Jay approached the kitchen, he saw his grandmother lying on the floor in the area between the kitchen and den. Jay testified that he noticed bruises on his grandmother's elbow; that a newspaper lay across her chest; and that the phone, having been dragged into the kitchen, was right beside her. When his grandmother did not respond to Jay's calling her name, he became scared and ran across the street to the residence of Tammy Bolen. After Jay alerted Mrs. Bolen to the situation with his grandmother, Mrs. Bolen entered the house through the open garage and found the victim lying on the floor with blood and a newspaper on her chest and with her glasses knocked off her face. Mrs. Bolen used the victim's phone to call the victim's daughter, Lynette Tutterow.

Mrs. Tutterow arrived at her mother's house at approximately the same time as Charles White, Jr., defendant's father. Entering her mother's home behind Mr. White, Mrs. Tutterow found her mother lying on the den floor. She used the phone located beside her mother's body to dial 911. Mr. White picked up the shell casing from the floor and said "he knew who did this."

Sergeant Mickey Southern of the Forsyth County Sheriff's Department was the first law enforcement officer on the scene. Sergeant Southern testified that during his preliminary investigation he interviewed Charles White, who was visibly "upset." Charles told him that he had a son who had recently been released from prison in Morganton and that his son had left home and was missing. Sergeant Southern also testified that Charles stated he was missing four pistols from his residence, including a .22-caliber.

Sergeant J.W. Boles from the detective division of the Forsyth County Sheriff's Department arrived shortly after Sergeant Southern and also interviewed defendant's father. Sergeant Boles testified that Mr. White advised him that defendant had just gotten out of jail approximately two months before for stealing cars, theft of firearms, and breaking and entering. When Mr. White realized his son was missing, he searched defendant's room and found two empty gun cases. Mr. White then checked his gun safe and discovered that four guns were missing.

The pathologist who performed the autopsy on the victim testified that the cause of death was the gunshot wound to her chest but that the blunt trauma to her head contributed to her death. The pathologist determined that a small-caliber bullet entered the victim's chest just left of her breastbone. Additionally, the pathologist estimated that the victim suffered at least three blows to her face causing her broken nose and injuries to her jaw and forehead. The pathologist also determined, based on signs of a fresh hemorrhage in the soft tissues and swelling, that the victim was alive at the time she sustained the blunt-trauma injuries.

Defendant presented numerous witnesses who detailed defendant's history of psychological problems and inability to adjust in society. Additional evidence will be discussed as needed to address the issues.

## SENTENCING ISSUES

Defendant first argues that the trial court erred and abused its discretion in allowing the State to introduce evidence of defendant's purported satanic beliefs to establish defendant's motive for the murder; that the State's attempt to show a satanic motive for the murder was inconsistent with the submitted aggravating circumstances; that the undue prejudice of this evidence outweighed its probative value; and that for all these reasons, defendant's federal and state constitutional rights were violated. We disagree.

**STATE v. WHITE**

[355 N.C. 696 (2002)]

Prior to trial defendant filed a motion *in limine* to preclude the State from offering certain irrelevant and inflammatory evidence unrelated to defendant's religious beliefs or practices at trial. Although the written motion did not specifically mention defendant's satanic beliefs or practices, at the hearing on the motion, defendant argued that the State should be precluded from introducing items of physical evidence suggesting that defendant engaged in satanic practices. These items had been seized during a search of defendant's bedroom. Defendant also sought to preclude the anticipated testimony of State's witness Jeffrey Nash, who had been incarcerated with defendant and with whom defendant had talked, and the testimony of Detective Culbreth, who had interviewed Nash concerning statements made to him by defendant about killing "to get in good graces with his lord, the lord of darkness."

In ruling on defendant's motion *in limine*, the trial court indicated that aspects of the testimony had the potential to be inflammatory and prejudicial and that the court would conduct *voir dire* before permitting the testimony. The trial court noted that "there may be some aspects that will be admissible as to declaration of motive which would be a very legitimate issue in the case." During the presentation of evidence, when the State called Nash, the trial court conducted *voir dire* to determine the admissibility of statements made by defendant to Nash to the effect that defendant's motive in killing the victim was "to get in good graces with his lord, the lord of darkness." The trial court ruled that evidence of the satanic references was admissible "as long as it is interwoven with the issue of motive and in that context." The court stressed that the ruling was "not a license for the State to offer some generalized episodes about Satan worship."

Nash then testified, over objection, that defendant told him that "the police had the motive all wrong" and that "they thought he did it to rob the lady but instead he was doing it as a service to his higher power." According to Nash, defendant also stated that he was trying to "get in good . . . with the graces of the lord of darkness." Over defendant's objection, Detective Culbreth was permitted to testify for corroborative purposes as to statements that Nash had told her defendant had made to him. These statements were consistent with Nash's trial testimony.

On cross-examination of Detective Culbreth, defendant attempted to introduce evidence of statements made by defendant to Detective Culbreth en route from New Orleans to Winston-Salem.

The trial court again conducted *voir dire*. After noting that defendant's statements covered a wide range of topics, including details of the crime, defendant's performance of a satanic ritual, his rejection of the Christian faith, and his acceptance of satanism, the court held that if defendant cross-examined Detective Culbreth about any portion of the statements made to her, then "the door would be opened for the State to question this witness with regard to the other details of the statement given at that time." The trial court then ruled, however, that on account of the undue prejudice that could result from some of the statements and the likelihood that the jury would be unable to follow a curative instruction, the court would not permit evidence or testimony concerning defendant's performance of satanic rituals, his rejection of the Christian faith, his involvement in and acceptance of the skinhead society, or his professed allegiance to Satan as the lord of the underworld. Defendant did not pursue this line of questioning with Detective Culbreth.

During defendant's case in chief, defense witness Phyllis Worrell, the mother of defendant's girlfriend, mentioned that defendant had been drunk one weekend and "had been talking something about the devil and this Satanic stuff that I didn't know about either at the time, and they were sort of preaching to him about God. Let it come out, let it fly. You know, getting him to rebuke the devil, I think." On cross-examination the prosecutor asked, "Did I hear you mention religion?" The prosecutor withdrew the question before the witness said anything further about defendant's practice of satanism. The trial court ruled that the prosecutor was entitled to delve into what the witness referred to. The witness then testified in answer to a follow-up question that she did not hear defendant talk much about it.

[1] Defendant argues that this Court's holding that the North Carolina Rules of Evidence do not apply in capital sentencing proceedings is not consistent with N.C.G.S. § 15A-2000 and that under a proper balancing test, the trial court should not have admitted testimony relating to defendant's statements concerning his motive for the murder. Defendant contends that this testimony does not support the State's theory of the case or the aggravating circumstances submitted to the jury, namely, that the murder was committed during the commission of a felonious robbery, N.C.G.S. § 15A-2000(e)(5)(2001), and that the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6). Defendant's contentions are without merit.

This Court has consistently held that the "North Carolina Rules of Evidence do not apply to sentencing hearings." *State v. Bond*, 345

N.C. 1, 31, 478 S.E.2d 163, 179 (1996), *cert. denied*, 521 U.S. 1124, 138 L. Ed. 2d 1022 (1997); *see also* N.C.G.S. § 8C-1, Rule 1101(b)(3) (2001). However, "[a]ny competent, relevant evidence which [will] substantially support the imposition of the death penalty may be introduced at this stage." *Bond*, 345 N.C. at 31, 478 S.E.2d at 179; *see also* N.C.G.S. § 15A-2000(a)(3). Inasmuch as any relevant evidence may be introduced, " 'trial courts are not required to perform the Rule 403 balancing test during a sentencing proceeding.' " *State v. Golphin*, 352 N.C. 364, 464, 533 S.E.2d 168, 233 (2000) (quoting *State v. Flippen*, 349 N.C. 264, 273, 506 S.E.2d 702, 708 (1998), *cert. denied*, 526 U.S. 1135, 143 L. Ed. 2d 1015 (1999)), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001).

**[2]** In the present case, the State requested submission of and the trial court submitted to the jury the (e)(9) aggravating circumstance, whether the murder was especially heinous, atrocious, or cruel. N.C.G.S. §. 15A-2000(e)(9). Accordingly, the State was entitled to introduce any competent, relevant evidence to support a finding of this aggravator. *See* N.C.G.S. § 15A-2000(a)(3). While defendant is correct that the satanic references are irrelevant to the (e)(5) and (e)(6) aggravating circumstances, defendant's contention that the trial court erred in allowing the satanic evidence to establish motive is misplaced. In *State v. Golphin* the defendant wrote a note during trial indicating that the murders for which he and his brother were charged were racially motivated. This Court held that the note was admissible at sentencing to support the (e)(9) aggravator in that whether a murder was racially motivated may be some indication of the " 'depravity of defendant's character.' " *Golphin*, 352 N.C. at 464, 533 S.E.2d at 233 (quoting *State v. Moose*, 310 N.C. 482, 500, 313 S.E.2d 507, 519 (1984)). This Court further noted that what makes a murder especially heinous, atrocious, or cruel is " 'the entire set of circumstances surrounding the killing.' " *State v. Stanley*, 310 N.C. 332, 338-39, 312 S.E.2d 393, 397 (1984) (quoting *Magill v. State*, 428 So. 2d 649, 651 (Fla.), *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983)), *quoted in Golphin*, 352 N.C. at 464, 533 S.E.2d at 233. Whether the killing demonstrates a depravity of mind is a factor that may be considered in determining if the killing was especially heinous, atrocious, or cruel. *Golphin*, 352 N.C. at 464-65, 533 S.E.2d at 233; *see also State v. Kandies*, 342 N.C. 419, 450, 467 S.E.2d 67, 84, *cert. denied*, 519 U.S. 894, 136 L. Ed. 2d 167 (1996). Similarly, defendant's statements that the murder was satanically motivated may show depravity of mind and were, thus, properly admitted for the jury's

consideration in determining the existence of the (e)(9) aggravating circumstance. Defendant's attempt to distinguish *Golphin* on the basis that the note in *Golphin* was written by the defendant during trial is unpersuasive.

Moreover, in this case, defendant on cross-examination of Nash inquired, "What day was it that y'all were over there that he supposedly said this about the lord of darkness?" In response Nash stated, "I can't recall the exact date." Further, defense witness Phyllis Worrell's testimony referred to defendant talking about "the devil and this Satanic stuff." Hence, defendant lost the benefit of his objection. *State v. Alford*, 339 N.C. 562, 570, 453 S.E.2d 512, 516 (1995) (holding that "[w]here evidence is admitted over objection and the same evidence has been previously admitted or is later admitted without objection, the benefit of the objection is lost"). Having himself solicited direct references to his satanic comments, defendant cannot now complain about the State's introduction of the same or similar evidence.

Finally, we note that even though he was not entitled to it, defendant received the benefit of the trial court's balancing the unduly prejudicial effect of the evidence against its probative value under Rule 403 of the North Carolina Rules of Evidence and limiting the State to that portion which showed motive for the killing. The fact that the jury did not find the (e)(9) aggravator is not relevant to the admissibility of the evidence, but the failure to find the aggravator is some indication that the jury carefully considered the evidence and was not influenced by it in rendering its decision. Accordingly, these assignments of error are overruled.

[3] Defendant next contends that the trial court erred by allowing the State to introduce the substance of Jeffrey Nash's statement to Detective Culbreth to corroborate his previous testimony. We disagree.

The trial court allowed Detective Culbreth to read to the jury the unsworn statement of Nash for the narrow purpose of corroborating Nash's in-court testimony. Defendant first argues the inappropriateness of Detective Culbreth's testimony relating Nash's statements for the same reasons advanced in his previous argument. Defendant further contends that Culbreth's testimony went beyond the scope of and did not corroborate Nash's in-court testimony by including statements by Nash referencing defendant's fascination with the movie "Natural Born Killers."

As stated above, the North Carolina Rules of Evidence do not apply to sentencing hearings, *Bond*, 345 N.C. at 31, 478 S.E.2d at 179; and the State may present any evidence that is competent and relevant to the submitted aggravating circumstances, *Golphin*, 352 N.C. at 464, 533 S.E.2d at 233. In this case Nash's statements were relevant to the (e)(9) aggravating circumstance; Culbreth's testimony corroborated Nash's in-court testimony; and admission of Culbreth's testimony was, thus, proper. Regarding statements related by Culbreth as to which Nash did not specifically testify, defendant has waived his objection. In cross-examining Billie Johnson, defendant's girlfriend, the State, without objection, elicited the fact that defendant signed many of his letters "from Mickey," a reference to the movie "Natural Born Killers," which they both liked. Further, defense witness Dr. James Hilkey testified without objection about defendant's fascination with the movie and with killing. Thus, defendant lost the benefit of his earlier objection. *See Alford*, 339 N.C. at 570, 453 S.E.2d at 516. These assignments of error are overruled.

**[4]** Defendant next argues that the trial court committed reversible error by allowing the State to introduce testimony that referred to the movie "Natural Born Killers" and characterized defendant as a "sick minded person." Defendant contends that this evidence was not relevant to any aggravating circumstance and that its undue prejudice outweighed its probative value. For the reasons discussed in the previous argument, defendant's arguments relating to references to the movie "Natural Born Killers" and to Dr. Hilkey's testimony about defendant's poem and fascination with killing are without merit. As to the argument that the State was improperly allowed to elicit hearsay testimony from Detective Jason Swaim that defendant's girlfriend referred to defendant as a "sick minded person," assuming *arguendo* that admission of this evidence was error, defendant has failed to show unfair prejudice entitling him to relief. Defendant's expert testimony as to mitigating circumstances was premised on defendant's being under the influence of mental or emotional disturbance at the time of the murder, and defendant presented substantial evidence to show that he suffered from severe psychological disturbance. Since the jury found the existence of this mitigating circumstance, the girlfriend's shorthand, lay characterization of defendant's problems could not have prejudiced defendant. *See* N.C.G.S. § 15A-1443(a) (2001). Accordingly, these assignments of error are overruled.

**[5]** Defendant next argues that the trial court erred in allowing the State to introduce a newspaper allegedly found on the victim's chest and photographs of the victim's body showing the newspaper on her chest. Defendant contends that the State failed to lay a proper foundation to show that the newspaper was placed on the victim's body by defendant. Defendant places great emphasis on the fact that the neighbor, Mrs. Tammy Bolen, who the victim's grandson Jay Tutterow summoned after finding his grandmother, gave a statement two days later in which she stated:

> I told the detectives that the newspaper was lying across Evvie's chest when I got there but now that I think about it the newspaper was not lying across her when I got there because I remember seeing the blood on her chest. I do not know who put the newspaper on her.

At trial Mrs. Bolen testified that she saw a newspaper on the victim's body and positively identified State's exhibits 8 and 9, photographs of the scene, as illustrating her testimony. Mrs. Bolen explained that upon seeing the photographs, she understood why she thought she had seen a newspaper but then questioned whether she had seen the newspaper because she remembered the blood on the victim's chest. Other witnesses, including the grandson, the medical examiner and law enforcement officers, testified to seeing the newspaper turned to the obituary page lying on the victim's chest. However, the evidence was in conflict on this point. Charles White, defendant's adoptive father, testified that he did not observe a newspaper over the victim; and Detective Culbreth testified that defendant denied placing the newspaper on the victim.

The State is entitled to present any competent, relevant evidence pertaining to sentencing, N.C.G.S. § 15A-2000(a)(3); and the Rules of Evidence do not apply to require a balancing test, *Golphin*, 352 N.C. at 464, 533 S.E.2d at 233. Any evidence pertaining to the circumstances of the crime and to defendant is relevant at sentencing. *See Lockett v. Ohio*, 438 U.S. 586, 604, 57 L. Ed. 2d 973, 990 (1978). The question of whether and when the newspaper was placed on the victim's chest was for the jury to decide. Even assuming *arguendo* that the State failed to lay a proper foundation, defendant has not met his burden of showing how he was prejudiced by the introduction of this evidence, N.C.G.S. § 15A-1443(a), and these assignments of error are overruled.

STATE v. WHITE

[355 N.C. 696 (2002)]

**[6]** Defendant next contends that the trial court erred in submitting both statutory aggravating circumstances that the murder was committed while defendant was engaged in the commission of an armed robbery, N.C.G.S. § 15A-2000(e)(5), and that it was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6). Defendant asserts that this error resulted in "double-counting," or the submission to the jury of two aggravating circumstances based upon the same evidence, thereby violating defendant's federal and state due process rights. Defendant further contends that this case is distinguishable from other cases in which this Court has upheld the submission of both of these aggravators in that the trial court failed to limit the evidence that the jury could consider under the pecuniary gain aggravating circumstance. We disagree.

North Carolina law provides that " '[d]ouble-counting' occurs when two aggravating circumstances based upon the same evidence are submitted to the jury." *State v. Call*, 349 N.C. 382, 426, 508 S.E.2d 496, 523 (1998).

> "It is established law in North Carolina that it is error to submit two aggravating circumstances when the evidence to support each is precisely the same. Conversely, where the aggravating circumstances are supported by separate evidence, it is not error to submit both to the jury, even though the evidence supporting each may overlap."

*State v. Davis*, 353 N.C. 1, 42, 539 S.E.2d 243, 270 (2000) (quoting *State v. East*, 345 N.C. 535, 553-54, 481 S.E.2d 652, 664, *cert. denied*, 522 U.S. 918, 139 L. Ed. 2d 236 (1997)) (citations omitted), *cert. denied* 534 U.S. 839, 151 L. Ed. 2d 55 (2001).

In this case, separate, independent evidence supported submission of both the (e)(5) and (e)(6) aggravating circumstances. As in *Davis* and *East* the theft of the keys and the automobile in the instant case supported the armed robbery necessary for the (e)(5) aggravating circumstance. *See Davis*, 353 N.C. at 42, 539 S.E.2d at 270; *East*, 345 N.C. at 554, 481 S.E.2d at 665. Defendant's evidence demonstrated that he stole the victim's Cadillac for transportation, not to sell it. Indeed, defendant told his girlfriend that he "would be riding in style in a Cadillac." Similarly, defendant's theft of money from the victim's purse supported the (e)(6) pecuniary gain aggravating circumstance just as the defendant's theft of credit cards, checks, and a purse in *Davis* supported the (e)(6) aggravating circumstance. *See Davis*, 353 N.C. at 42, 539 S.E.2d at 270.

Moreover, contrary to defendant's contention, the trial court properly limited the jury's consideration of the evidence supporting the (e)(5) and (e)(6) aggravating circumstances. Regarding the (e)(5) aggravating circumstance, the trial court instructed the jury, "[W]ith respect to this particular aggravating circumstance, members of the jury, the property which the State contends was taken and carried away allegedly is the Cadillac automobile of the deceased." Regarding the (e)(6) aggravating circumstance, the trial court, after instructing that pecuniary gain meant that defendant "has obtained or intends or expects to obtain money or some other thing which can be valued in money," then instructed, "[I]f you find from the evidence and beyond a reasonable doubt that when the defendant killed the victim, the defendant obtained money as a result, you would find this aggravating circumstance and would so indicate by having your foreperson write 'yes' in the space after this aggravating circumstance on the Issues and Recommendation form." Pursuant to these instructions the jury was not permitted to find both aggravating circumstances based upon the same evidence. As in *Davis* each circumstance was "supported by sufficient, independent evidence," and the instruction to the jury was proper. *Id.* at 43, 539 S.E.2d at 270. These assignments of error are, therefore, overruled.

**[7]** Defendant next contends the trial court erred in submitting the (e)(6) aggravating circumstance, that the victim's murder was committed for pecuniary gain, in that the evidence was insufficient to support a finding of this circumstance. Defendant argues that this aggravator examines a defendant's motive for the killing, not just the fact that money or something of value was taken at the time of the killing; and in this case, the evidence, according to defendant, does not show that the killing was motivated by pecuniary gain. Case law interpreting N.C.G.S. § 15A-2000(e)(6) states that

> "[t]he gravamen of the pecuniary gain aggravating circumstance is that 'the killing was for the purpose of getting money or something of value.' " *State v. Jennings,* 333 N.C. 579, 621, 430 S.E.2d 188, 210 (quoting *State v. Gardner,* 311 N.C. 489, 513, 319 S.E.2d 591, 606 (1984), *cert. denied,* 469 U.S. 1230, 84 L. Ed. 2d 369 (1985))[, *cert. denied,* 510 U.S. 1028, 126 L. Ed. 2d 602 (1993)]. This aggravating circumstance considers defendant's motive and is appropriate where the impetus for the murder was the expectation of pecuniary gain. For purposes of determining the sufficiency of the evidence, the evidence must be considered in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom.

*State v. Moore*, 335 N.C. 567, 610-11, 440 S.E.2d 797, 822 (citations omitted), *cert. denied*, 513 U.S. 898, 130 L. Ed. 2d. 174 (1994).

The evidence presented at trial tending to show that defendant killed for financial gain included, but was not limited to, the following: (i) at the time of the murder defendant was not working regularly at his painting job; (ii) defendant's father, Charles White, told investigators that defendant had "no money" and might have sold the weapons for cash to travel to Las Vegas or to go see his girlfriend in Mt. Airy or Virginia; (iii) following the shooting, defendant took approximately $100.00 and two keys from the victim's pocketbook; and (iv) defendant fled in the victim's car to a location near Charleston, West Virgnia, where he exchanged guns for drugs. Considered in the light most favorable to the State, a rational juror could find from this evidence that defendant's motive for the murder was, at least in part, to obtain money to finance his escapade. In talking with Detective Culbreth, defendant indicated that once he pointed the gun at the victim, he figured that he had committed a crime and that he might as well shoot. Defendant also told Nash that he was not crazy but that he would rather play crazy and be in an institution and that that was the only way he could beat the death sentence. These statements suggest that defendant may have fabricated the satanic, lord-of-darkness motive to mask his true intention. Having been previously convicted of breaking and entering and assault with a deadly weapon inflicting serious injury, defendant was not unfamiliar with the criminal process. Given this conflict in the evidence and taking the evidence in the light most favorable to the State, the trial court properly left determination of defendant's motive for the killing to the jury. This assignment of error is overruled.

[8] By his next assignment of error, defendant argues that the trial court erred in limiting the direct testimony of Dr. Halimena Creque, defendant's psychiatrist at Charter Hospital, and the testimony of Tom Desch, a licensed counselor who provided therapy to defendant after his release from Charter. Defendant asserts that limiting this testimony regarding defendant's family history to support mitigating circumstances violated his federal and state due process rights. Specifically, defendant attempted to ask Dr. Creque his opinion of "how well [defendant's] mother and father reacted to the treatment and therapy at Charter" and whether "[it is] important to you as a psychiatrist treating an adolescent as [the defendant] was at this point, to find out problems in family history, such as alcoholism or

violent tendencies." The trial court sustained the State's objections to these questions. The trial court also sustained the State's objection to comments by Mr. Desch that "[t]his was a very hard family to work with because there was so much going on" and that his "third goal was to work with the family to help them parent [defendant] in a way that worked better for [defendant]" as well as Mr. Desch's characterization of defendant's maternal grandmother as "overbearing."

As to the question put to Dr. Creque concerning defendant's parents' reaction to defendant's treatment at Charter, defendant did not make a record of what the answer would have been had Dr. Creque been permitted to respond; hence, this Court cannot conduct appellate review as to possible prejudice. *See State v. Miller*, 321 N.C. 445, 452, 364 S.E.2d 387, 391 (1988). However, the trial court properly noted in sustaining the objection that the parents were not on trial and that their conduct was not at issue.

The scope of mitigation in a capital sentencing proceeding is "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604, 57 L. Ed. 2d at 990. As this Court has previously noted, however, this rule does not " 'limit[] the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.' " *State v. Bowman*, 349 N.C. 459, 479, 509 S.E.2d 428, 440 (1998) (quoting *Lockett*, 438 U.S. at 604 n.12, 57 L. Ed. 2d at 990 n.12), *cert. denied*, 527 U.S. 1040, 144 L. Ed. 2d 802 (1999); *accord State v. Nicholson*, 355 N.C. 1, 40, 558 S.E.2d 109, 136 (2002).

As in *Nicholson* the conduct of other family members did not relate to any aspect of defendant's character or record or to circumstance of the offense. *Nicholson*, 355 N.C. at 39, 558 S.E.2d at 136. Therefore, the trial court did not err in excluding this evidence, which was not relevant to mitigation. Moreover, with respect to Mr. Desch's comments, the witness answered before the court ruled on the objection; and the prosecutor did not move to strike. Thus, defendant had the benefit of this testimony. This assignment of error is overruled.

[9] Defendant next contends that the trial court erred in overruling defendant's objection to a question asked of Jay Tutterow, the victim's grandson, and of Lynette Tutterow, the victim's daughter, by the prosecutor. Defendant contends that the court's failure to sustain his

**STATE v. WHITE**

[355 N.C. 696 (2002)]

objection to the question whether defendant had ever apologized for his actions violated defendant's Fifth Amendment right against self-incrimination and his due process rights under the North Carlina Constitution. We disagree.

We note initially that the prosecutor asked neither witness if defendant had apologized. Rather, the prosecutor asked Detective Culbreth if she knew whether defendant had told either Jay Tutterow or Lynnette Tutterow that he was sorry for what he had done to the victim. Detective Culbreth answered that she did not know. Assuming *arguendo* that the prosecutor's question was improper, the error was harmless beyond a reasonable doubt inasmuch as the witness answered that she did not know, and no further mention was made of remorse. *See* N.C.G.S. § 15A-1443(b). Accordingly, this assignment of error is overruled.

**[10]** By another assignment of error defendant contends that the trial court erred in submitting the (e)(3) aggravating circumstance, that "defendant had been previously convicted of a felony involving the use of violence to the person." Defendant argues that, given defendant's age at the time of the previous conviction, the use of this conviction to support the death penalty violates defendant's Eighth, Fourteenth, and Fifth Amendment rights under the federal Constitution and his rights under Article I, Section 27 of the North Carolina Constitution. Defendant was fifteen years old on 25 March 1993, the date of the assault with a deadly weapon inflicting serious injury for which he was tried and convicted as an adult on 6 October 1993; defendant was sixteen years old at the time of the trial, having had a birthday on 16 June. Defendant presents no authority in support of this argument.

In a capital sentencing proceeding, the State must present evidence sufficient to prove an aggravating circumstance beyond a reasonable doubt. *State v. Johnson*, 298 N.C. 47, 75, 257 S.E.2d 597, 617 (1979); *see also* N.C.G.S. 15A-2000(c)(1). The (e)(3) aggravating circumstance states:

The defendant had been previously convicted of a felony involving the use or threat of violence to the person or had been previously adjudicated delinquent in a juvenile proceeding for committing an offense that would be a Class A, B1, B2, C, D, or E felony involving the use or threat of violence to the person if the offense had been committed by an adult.

N.C.G.S. § 15A-2000(e)(3). A conviction for assault with a deadly weapon inflicting serious injury satisfies the requirement of a felony involving the use or threat of violence to the person. *State v. Rose*, 335 N.C. 301, 338-39, 439 S.E.2d 518, 538-39, *cert. denied*, 512 U.S. 1246, 129 L. Ed. 2d 883 (1994), *and overruled on other grounds by State v. Buchanan*, 353 N.C. 332, 543 S.E.2d 823 (2001).

Felonious assault with a deadly weapon inflicting serious injury is a class E felony. N.C.G.S. § 14-32(b) (2001). Thus, defendant's conviction would have qualified as an (e)(3) aggravating circumstance even if he had had a juvenile adjudication rather than being tried as an adult. The age of the perpetrator is irrelevant if the previous conviction of a violent felony or juvenile adjudication meets the criteria for the (e)(3) aggravating circumstance. *See State v. Wiley*, 355 N.C. 592, 605, 565 S.E.2d 22, 34 (2002).

**[11]** Defendant next contends that the trial court erred in denying his pretrial motion *in limine* to preclude introduction of certain autopsy and crime scene photographs. The photographs at issue involved four that showed the victim's body from various angles at the crime scene and nine taken during the autopsy of the victim. Relying on *State v. Hennis*, 323 N.C. 279, 372 S.E.2d 523 (1988), defendant contends that the photographs were gruesome and inflammatory and had no probative value and that their admission violated defendant's rights under the federal and state Constitutions, Rule 403 of the North Carolina Rules of Evidence, and this Court's holding in *Hennis*.

As noted earlier, the Rules of Evidence are not applicable to a capital sentencing proceeding; hence, the trial court was not required to engage in the Rule 403 balancing test. *Bond*, 345 N.C. at 31, 478 S.E.2d at 179. In *State v. Call* we reiterated the holding in *Hennis* as follows:

> In *Hennis*, this Court concluded that the admission into evidence of photographs which have no probative value beyond that of previously introduced photos constitutes reversible error where their content is gory, they are redundant and repeatedly shown to the jury, and there is a lack of overwhelming evidence of an accused's guilt. [*Hennis*, 323 N.C.] at 286-87, 372 S.E.2d at 528. However, we continue to recognize the long-standing rule that photographs of a murder victim, though gory or gruesome, may be introduced for illustrative purposes so long as they are

STATE v. WHITE

[355 N.C. 696 (2002)]

not used in an excessive or repetitious manner aimed exclusively at arousing the passions of the jury. *Id.* at 283, 372 S.E.2d at 526. Moreover, the trial court must still balance the prejudicial effect of relevant evidence, including photographs, against its probative value before that evidence can be introduced or excluded. N.C.G.S. § 8C-1, Rule 403 (1997). Finally, what constitutes an excessive number of photos, given the illustrative value of each, is a matter that falls within the trial court's discretion. *Hennis*, 323 N.C. 279, 372 S.E.2d 523.

*Call*, 349 N.C. at 414, 508 S.E.2d at 516.

In the present case the trial court noted that each of the photographs represented different aspects of the victim and the autopsy. From the record before us, we conclude that the number of photographs submitted into evidence was not unduly repetitious, nor were the photographs merely aimed at arousing the passions of the jury. Each of the pictures submitted by the State had illustrative and probative value and was, thus, properly admitted into evidence. The trial court's denial of defendant's motion *in limine* was not error. Accordingly, these assignments of error are without merit.

[12] Defendant next contends that the trial court erred by allowing the State to introduce into evidence a cookbook that was dedicated to the victim. Relying on *Payne v. Tennessee*, 501 U.S. 808, 825, 115 L. Ed. 2d 720, 735 (1991), defendant argues that his sentencing was fundamentally unfair as a result of admitted prejudicial evidence. We disagree.

This Court, relying on the *Payne* opinion, recently addressed the admissibility of victim-impact statements as follows:

In *Payne v. Tennessee*, 501 U.S. 808, 825, 115 L. Ed. 2d 720, 735 (1991), the United States Supreme Court held that victim-impact statements are admissible and relevant to the jury's decision whether to impose the death penalty. North Carolina has adopted this rule to allow evidence of victim impact in sentencing hearings. "A victim has the right to offer admissible evidence of the impact of the crime, which shall be considered by the court or jury in sentencing the defendant. The evidence may include . . . [a] description of the nature and extent of any physical, psychological, or emotional injury suffered by the victim as a result of the offense committed by the defendant." N.C.G.S. § 15A-833(a)(1) (1999). The admissibility of victim-impact state-

ments is limited by the requirement that they not be "so prejudi-
cial as to 'render[] the [trial] fundamentally unfair.' " [*State v.*]
*Smith,* 352 N.C. [531,] 554, 532 S.E.2d [773,] 788 [(2000)] (quoting
*Payne,* 501 U.S. at 825, 115 L. Ed. 2d at 735) (first alteration in
original) [, *cert. denied,* 532 U.S. 949, 149 L. Ed. 2d 360 (2001)].

*Nicholson,* 355 N.C. at 39, 558 S.E.2d at 135-36 (alterations in
original).

In this case the memorial cookbook introduced was not unduly
prejudicial. The evidence merely reflected the high regard in which
the victim was held among her family and throughout her community.
Moreover, defendant presented evidence of similar import through
the testimony of defendant's mother, who stated that the victim was
"like my mama." As in *Nicholson* nothing suggests that the jury based
its decision solely on such evidence; and none of the aggravating cir-
cumstances submitted to the jury derived from such evidence. The
trial court properly admitted the cookbook, and this assignment of
error is overruled.

## PROPORTIONALITY

[13] Finally, this Court exclusively has the statutory duty in capital
cases, pursuant to N.C.G.S. § 15A-2000(d)(2), to review the record
and determine: (i) whether the record supports the jury's findings of
the aggravating circumstances upon which the court based its death
sentence; (ii) whether the sentence was imposed under the influence
of passion, prejudice, or any other arbitrary factor; and (iii) whether
the death sentence is excessive or disproportionate to the penalty
imposed in similar cases, considering both the crime and the defend-
ant. N.C.G.S. § 15A-2000(d)(2); *see also State v. McCollum,* 334 N.C.
208, 239, 433 S.E.2d 144, 161 (1993), *cert. denied,* 512 U.S. 1254, 129
L. Ed. 2d 895 (1994).

After a thorough review of the transcript, record on appeal,
briefs, and oral arguments of counsel, we are convinced that the
jury's findings of three of the four aggravating circumstances submit-
ted were supported by the evidence. We also conclude that nothing in
the record suggests that defendant's death sentence was imposed
under the influence of passion, prejudice, or any other arbitrary
factor.

Finally, we must consider whether the imposition of the death
penalty in defendant's case is proportionate to other cases in which
the death penalty has been affirmed, considering both the crime and

the defendant. *State v. Robinson,* 336 N.C. 78, 133, 443 S.E.2d 306, 334 (1994), *cert. denied,* 513 U.S. 1089, 130 L. Ed. 2d 650 (1995). The purpose of proportionality review is "to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden,* 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied,* 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Proportionality review also acts "[a]s a check against the capricious or random imposition of the death penalty." *State v. Barfield,* 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied,* 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). Our consideration is limited to those cases that are roughly similar as to the crime and the defendant, but we are not bound to cite every case used for comparison. *State v. Syriani,* 333 N.C. 350, 400, 428 S.E.2d 118, 146, *cert. denied,* 510 U.S. 948, 126 L. Ed. 2d 341 (1993). Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green,* 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied,* 513 U.S. 1046, 130 L. Ed. 2d 547 (1994).

Defendant pled guilty to first-degree murder. The jury found three of the aggravating circumstances submitted: (i) that defendant had been previously convicted of another felony involving the threat of violence to the person, N.C.G.S. § 15A-2000(e)(3); (ii) that the murder was committed while the defendant was engaged in the commission of robbery with a firearm, N.C.G.S. § 15A-2000(e)(5); and (iii) that the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6). A fourth aggravating circumstance was submitted to but not found by the jury: that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9).

The trial court submitted four statutory mitigating circumstances for the jury's consideration: (i) the murder was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2); (ii) defendant's capacity to appreciate the criminality of his conduct was impaired, N.C.G.S. § 15A-2000(f)(6); (iii) defendant's age at the time of the crime, N.C.G.S. § 15A-2000(f)(7); and (iv) the catchall mitigating circumstance that there existed any other circumstance arising from the evidence which the jury deemed to have mitigating value, N.C.G.S. § 15A-2000(f)(9). The jury found three of the statutory mitigating circumstances to exist. The trial court also submitted twenty-one nonstatutory mitigating circumstances; the jury found thirteen of these to exist.

We begin our proportionality analysis by comparing this case to those cases in which this Court has determined the sentence of death to be disproportionate. This Court has determined the death sentence to be disproportionate on seven occasions. *State v. Benson,* 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes,* 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers,* 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines,* 345 N.C. 647, 483 S.E.2d 396, *cert. denied,* 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young,* 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill,* 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant,* 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson,* 309 N.C. 26, 305 S.E.2d 703 (1983). This case is not substantially similar to any of the cases in which this Court has found that the death sentence was disproportionate.

In this case defendant pled guilty to first-degree murder. As a result, defendant "admitted guilt 'upon any and all theories available to the state,' including premeditation and deliberation and the felony murder rule." *State v. Meyer,* 353 N.C. 92, 120, 540 S.E.2d 1, 18 (2000) (quoting *State v. Silhan,* 302 N.C. 223, 263, 275 S.E.2d 450, 478 (1981), *overruled on other grounds by State v. Sanderson,* 346 N.C. 669, 488 S.E.2d 133 (1997)), *cert. denied,* 534 U.S. 839, 151 L. Ed. 2d 54 (2001). A conviction under the theory of "premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis,* 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds,* 494 U.S. 1023, 108 L. Ed. 2d 604 (1990).

We further note that the sentencing jury found three aggravating circumstances in this case. Of the seven cases in which this Court has found a death sentence disproportionate, the jury found multiple aggravating circumstances to exist in only two. *Young,* 312 N.C. 669, 325 S.E.2d 181; *Bondurant,* 309 N.C. 674, 309 S.E.2d 170. We conclude that this case is not substantially similar to either of those cases.

We also consider cases in which this Court has found the death penalty to be proportionate. Defendant in this case entered an elderly victim's home, shot her in the chest, and stomped her head before leaving her to die. "A murder in the home 'shocks the conscience, not only because a life was senselessly taken, but because it was taken [at] an especially private place, one [where] a person has a right to feel secure.' " *State v. Adams,* 347 N.C. 48, 77, 490 S.E.2d 220, 236 (1997) (quoting *State v. Brown,* 320 N.C. 179, 231, 358 S.E.2d 1, 34, *cert. denied,* 484 U.S. 970, 98 L. Ed. 2d 406 (1987)) (alterations in orig-

inal), *cert. denied,* 522 U.S. 1096, 139 L. Ed. 2d 878 (1998); *accord Nicholson,* 355 N.C. at 72, 558 S.E.2d at 155. Further, both the (e)(5) and (e)(3) aggravating circumstances were found to exist by the jury. This Court has held that either of these aggravating circumstances, standing alone, is sufficient to sustain a sentence of death. *State v. Bacon,* 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied,* 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995). Viewed in this light, we conclude that the present case bears more similarity to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence disproportionate or to those in which juries have consistently returned recommendations of life imprisonment.

Defendant received a fair capital sentencing proceeding, free from prejudicial error; and the death sentence in this case is not disproportionate. Accordingly, the judgment of the trial court is left undisturbed.

NO ERROR.