WAINWRIGHT, Justice.
On 8 March 2002, defendant Reche Smith was convicted of first-degree murder and felony larceny. The jury found defendant guilty of first-degree murder on the basis of malice, premeditation, and deliberation and under the felony murder rule. Following a capital sentencing hearing, the jury recommended asentence of death for the murder. The trial court accordingly imposed a sentence of death for the murder and further imposed a sentence of fifteen to eighteen months imprisonment for the felony larceny.
The evidence at trial showed the following: At 6:00 a.m. on 10 March 2001, the victim, Charles King (King), was at his home in Plymouth, North Carolina, when defendant knocked on his door. King, wearing a bathrobe and thermal shirt and pants, answered the door, and defendant asked him for a glass of water. King invited defendant into his home and headed toward his kitchen to get the water. However, before King reached the kitchen, defendant grabbed King around his neck and choked him until he became unconscious. Defendant then bound King's wrists with clear packaging tape, went to another room in King's house, found a clock, and used the clock's extension cord first to bind King's wrists and then his ankles. Next defendant covered King's entire face, including his nose and mouth, with clear packaging tape and pushed King under a hospital bed. Defendant left King under the bed to die of asphyxiation while he searched King's house for something to steal. As King lay suffocating under his bed, defendant took $250 from an envelope in King's bedroom, $20 from King's wallet, King's cell phone, bank card, and car keys. After thirty minutes of searching King's house and stealing these items, defendant took King's car, drove to Williamston, North Carolina, rented a room at a motel, and bought crack cocaine.
The next day defendant drove King's car to a local Burger King, where he stole a woman's purse and drove away. A man at the restaurant saw the license plate number on King's caras defendant fled the restaurant. A Burger King cashier relayed the license plate number to a police officer.
A short while later, Corporal Scott McDougal of the Williamston Police Department spotted the car defendant was driving. Several officers, including Deputy Jason Branch of the Martin County Sheriff's Department, pursued defendant. Eventually, defendant stopped his car and fled into the woods, where Deputy Branch overtook him on foot and arrested him.
When Corporal McDougal arrived at the scene of the arrest, he examined the car defendant had been driving. Inside he found the purse defendant had just stolen, a set of keys, a cell phone, a knife, a homemade crack pipe, and a bank card bearing the name Charles King. Corporal McDougal also confirmed that the car defendant drove during the chase belonged to Charles King. The officers took defendant to the Martin County Sheriff's Department for questioning and later transported him to the Bertie-Martin Regional Jail.
Later on 11 March 2001, defendant called his wife, Rita Smith (Rita), from whom he was separated, and claimed he was in jail for snatching a purse. Defendant then began to cry and told his wife he would never get out of jail because he killed someone in Plymouth. Rita then asked defendant to let her speak to the sheriff. She asked the sheriff why defendant was in jail. The sheriff replied that defendant had stolen a woman's purse and fled in a car registered to Charles King. After talking with defendant and the sheriff, Rita relayed the story to her mother and speculated that defendant killed King. Rita knew King because she had bought cologne from him in the past. Rita andher mother attempted to call King at his home, but no one answered.
Two days after the murder, Rita relayed the contents of her conversation with defendant to her friend, Brenda Jackson. Rita and Jackson again called King's home, but no one answered. After receiving no reply from King, Rita and Jackson called Detective John Floyd, Chief of Police in Plymouth, North Carolina. Jackson relayed information to Chief Floyd about defendant's conversation with Rita. Jackson asked Floyd to go by King's house to check on King's whereabouts.
When Chief Floyd and Officer Heather Thompkins arrived at King's house, they knocked on the doors and received no answer. One officer gained entry to the house through a window and let the other one in through a door. Once inside, they noticed a bedroom had been ransacked. The officers discovered King's body under a hospital bed.
On 13 March 2001, Dr. Paul Spence, M.D., conducted an autopsy on King at Pitt County Memorial Hospital. The autopsy revealed only one significant external injury, a scratch on King's left shin. Internal injuries were consistent with manual choking: bruises and bleeding into the muscles surrounding the voice box and bits of hemorrhage inside the structure of the thyroid cartilage. King's hands were swollen and purple-red in color, indicating King was alive at the time defendant bound him with the tape and electrical cord. Dr. Spence stated that King's death was caused by asphyxia resulting from blockage of the nose and mouth due to tape bound around the head. In Dr. Spence's estimation, once defendant placed tape on King's nose and mouth, King became brain dead in two to three minutes and his heartstopped after ten to twenty minutes. Dr. Spence also determined that King could have remained conscious for a portion of that time. Finally, Dr. Spence testified King could have regained consciousness after defendant choked him and been aware of his condition, but because of his lack of oxygen, King would have been unable to move.
Additional relevant facts will be presented when necessary to resolve specific assignments of error raised by defendant.
JURY SELECTION
Defendant first argues the trial court erred by denying his challenge for cause to prospective juror Charles Hassell. During voir dire, Hassell indicated he was strictly against drug use. Defense counsel then asked Hassell the following question:
[Y]our position is such concerning drug use and abuse that in the event evidence came out in this trial that drug use was involved, it would affect or impair - substantially impair your ability to be fair and impartial; is that correct?
Hassell replied "yes" to this question. Defendant then challenged Hassell for cause.
In response, the trial court engaged in the following colloquy with Hassell:
THE COURT: Well let me - Mr. Hassell, let me ask you . . . just a couple of questions if I could. I don't mean to embarrass you. There are no right or wrong answers, and I want to make sure I understand what you're saying, and I'm trying to frame the question in a way that - are you saying to me, sir, that your personal feelings about the use or use [sic] of or possession of drugs is such that it would interfere or prevent you from following the law in this - as I would instruct you as it relates to this case?
MR. HASSELL: Well, I could follow the law.
THE COURT: All right. Now - and so I want to make sure what you're saying - you know, many people don't like drugs, don't approve of drugs, and I don't believe that's the question that [the defense attorney] was asking you, and that may have been how - that may have been what you are saying. I don't know one way or the other.
I'm not trying to put words in your mouth, but I - I'm just making sure I understand that's what you were saying or whether what you were saying is you didn't like drugs or are you saying to me that your feeling is such-I'm asking you as to whether or not your personal feelings about particular crimes or particular types of conduct are such that it would overwhelm your reason and common sense and your ability to follow the law as I would instruct you on should we reach some aspect of the case that may relate to the consumption or use or possession of drugs?
MR. HASSELL: No. It wouldn't do that.
THE COURT: You would be able and could and would follow the law as I would instruct you on regardless of what your own personal feelings would be as it relates to the use or possession of or consumption of drugs; is that correct?
MR. HASSELL: Yes.
THE COURT: Are you sure of that answer, sir?
MR. HASSELL: Yeah.
THE COURT: All right. The Challenge for cause is denied.
Defendant properly preserved error by exhausting the peremptory challenges available to him, renewing his challenge to prospective juror Hassell, and having his renewed challenge denied. N.C.G.S. § 15A-1214(h) (2003). However, in addition to preserving error, defendant must show error by (1) demonstrating that the trial court abused its discretion in denying the challenge, and (2) showing defendant was prejudiced by this abuseof discretion. State v. Grooms, 353 N.C. 50, 68, 540 S.E.2d 713, 725 (2000), cert. denied, 534 U.S. 838, 151 L. Ed. 2d 54 (2001).
Defendant contends the trial court improperly rehabilitated Hassell with leading questions, despite the prohibition against reducing determinations of juror bias "to question-and-answer sessions which obtain results in the manner of a catechism." Wainwright v. Witt, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 852 (1985). However, we conclude that the trial court did not lead Hassell to answer that he would follow the law. Rather, the trial court questioned Hassell in an effort to determine whether, despite Hassell's feelings about drug use, he could follow the law.
We further conclude that the trial court did not abuse its discretion by denying defendant's challenge for cause. As the United States Supreme Court further stated in Wainwright:
What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror.
Id. at 424-26, 83 L. Ed. 2d at 852-53 (footnote omitted). Thus, we must give substantial weight to the trial court's determination that Hassell was not biased. We defer to the trial court who could see and hear Hassell, and we conclude that the trial court did not abuse its discretion by denying defendant'schallenge for cause. Defendant's assignment of error is overruled.
Next, defendant contends the trial court erred by failing to give him an additional peremptory challenge. Defendant claims he was entitled to an additional peremptory challenge because the trial court removed a seated juror for cause before the end of jury selection and after defendant had used all but one of his remaining peremptory challenges.
After both defendant and the prosecution accepted prospective juror Gloria Cox, Cox brought the trial court a note from her doctor recommending that she be excused from jury duty because serving as a juror would be too stressful for her. The trial court dismissed Cox for cause. Defendant then requested an additional peremptory challenge, stating that he had undergone a substantial portion of jury selection believing that Cox would be a juror. The trial court denied defendant's request.
Defendant contends the trial court erred by failing to use its inherent authority to restore a peremptory challenge to remedy a prejudicial development in jury selection. However, we disagree. Although a trial court must grant a defendant an additional peremptory challenge if, upon reconsideration of the defendant's previously denied challenge for cause, "the judge determines that the juror should have been excused for cause," N.C.G.S. § 15A-1214(i) (2003), trial courts generally have no authority to grant additional peremptory challenges. See, e.g., State v. Barnes, 345 N.C. 184, 208, 481 S.E.2d 44, 57 ("[T]he trial court ha[s] no authority to grant any additional peremptory challenges . . . ."), cert. denied, 522 U.S. 876, 139 L. Ed. 2d 134 (1997), and, cert. denied, 523 U.S. 1024, 140 L. Ed. 2d 473(1998), and State v. Hunt, 325 N.C. 187, 198, 381 S.E.2d 453, 460 (1989) ("[T]he trial court ha[s] no authority to increase the number of peremptory challenges . . . . "). In fact, trial courts are "precluded from authorizing any party to exercise more peremptory challenges than specified by statute." State v. Dickens, 346 N.C. 26, 41, 484 S.E.2d 553, 561 (1997) (holding that the trial court did not err by refusing to grant the defendant an additional peremptory challenge following the reexamination and excusal for cause of a juror). Because the trial court had no authority to provide defendant with additional peremptory challenges, defendant's argument is without merit and we overrule this assignment of error.
Next, defendant contends the trial court failed to comply with the N.C.G.S. § 15A-1214(a) requirement for random jury selection when it placed a prospective juror in a specific seat after that juror was randomly called to fill another seat. Prospective juror Jonas Simpson, who had been summoned in the initial group of venire members to be examined for fitness to serve, was not present when the clerk called his name. The trial court called another prospective juror in Simpson's place. The trial court then examined this prospective juror and two other prospective jurors. Following a recess, Simpson arrived at the courtroom. The trial court placed him in panel A, seat twelve, the panel and seat for which he was originally called. After the trial court and the prosecutor questioned Simpson, the trial court allowed the prosecutor's request to challenge Simpson for cause, finding that Simpson was unequivocally opposed to the death penalty. Defendant contends the trial court violated the § 15A-1214(a) requirement for random jury selection when it placed Simpson in a specific seat. However, defendant has waived review of this issue for two reasons. First, defendant failed to object to Simpson's placement in a non-random seat on constitutional grounds. "Constitutional questions that are not raised and passed upon in the trial court will not ordinarily be considered on appeal." State v. Cummings, 353 N.C. 281, 292, 543 S.E.2d 849, 856, cert. denied, 534 U.S. 965, 151 L. Ed. 2d 286 (2001). Therefore, defendant has waived review of any constitutional issues. Second, defendant failed to preserve his alleged statutory violation for review because he failed to follow the N.C.G.S. § 15A-1211(c) procedure for challenging the randomness of jury selection. Subsection 15A-1211(c) states that all such challenges "[m]ust be in writing," "[m]ust specify the facts constituting the ground of challenge," and "[m]ust be made and decided before any juror is examined." N.C.G.S. § 15A-1211(c)(2)-(4) (2003). These challenges must be made at the trial court level. Id. § 15A-1211(b) (2003). Defendant did not object to the trial court's placement of Simpson in a specific seat. Therefore, defendant has failed to preserve this issue for review, and we overrule his assignment of error.
GUILT-INNOCENCE PHASE
Defendant contends the trial court violated his constitutional right to present evidence by excluding the bases for his expert witness's opinion that he lacked the specific intent and the requisite mental state to commit murder. Dr. Holly Rogers, M.D., a staff psychiatrist at Duke University, testified that she diagnosed defendant as having cocainedependence. She further testified that defendant's dependency on cocaine impaired his ability to reason, plan, and think.
The trial court ruled that Dr. Rogers could not testify that she based her opinion partly on statements defendant made to her and statements defendant made to his family members about his drug use on the day of the murder. The trial court based its decision to exclude this testimony on Rule of Evidence 403, which allows a court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C.G.S. § 8C-1, Rule 403 (2003). The trial court found defendant's hearsay statements to Dr. Rogers and his family self-serving. Because the statements were the only evidence that defendant used cocaine the day of the murder, the trial court further found the jury would have difficulty following a limiting instruction and understanding that the statements were not offered for the truth of the matter. The court excluded the statements, finding that, pursuant to Rule 403, the danger of unfair prejudice, confusion of the issues, or misleading the jury outweighed the statements' probative value.
Defendant argues that this Court has consistently held that experts must be allowed to testify about the basis of their opinions. See, e.g., State v. Wade, 296 N.C. 454, 458, 251 S.E.2d 407, 409 (1979) (holding that the trial erred by failing to admit the basis for an expert's opinion). However, as we have repeatedly stated, the bases for an expert's opinion are not automatically admissible. See, e.g., State v. Workman, 344 N.C. 482, 495, 476 S.E.2d 301, 308 (1996) (stating that the bases foran expert's opinion are not automatically admissible); and State v. Baldwin, 330 N.C. 446, 456-57, 412 S.E.2d 31, 37-38 (1992) (affirming the trial court's exclusion of defendant's self-serving hearsay statements to his psychologist, even though those statements were the basis for the psychologist's expert opinion). As in Baldwin, the trial court in this case found defendant's statements relevant to show the basis for an expert opinion, but that those statements were likely to confuse the jury. We conclude that the trial court properly applied Rule 403 to find that although relevant, the danger of the statements prejudicing, confusing, or misleading the jury outweighed the statements' probative value. Therefore, the trial court did not abuse its discretion by excluding the statements and we overrule defendant's assignment of error.
Defendant next argues that the trial court erred in failing to intervene during the prosecutor's guilt-innocence phase closing argument when the prosecutor interjected opinions concerning information outside the record.
As a preliminary matter, we note that closing argument should not include the personal knowledge or beliefs of the arguing attorney, especially when the knowledge or beliefs involve matters not based on the evidence. See State v. Flowers, 347 N.C. 1, 36-37, 489 S.E.2d 391, 412 (1997), cert. denied, 522 U.S. 1135, 140 L. Ed. 2d 150 (1998); and State v. Solomon, 340 N.C. 212, 218, 456 S.E.2d 778, 783, cert. denied, 516 U.S. 996, 133 L. Ed. 2d 438 (1995). However, a prosecutor in a capital case has a duty to argue all the facts in evidence as well as all reasonable inferences stemming from these facts. State v. McCollum, 334 N.C. 208, 223 and 227, 433 S.E.2d 144, 152 and 154(1993), cert. denied, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). While effectuating this duty, prosecutors should be granted wide latitude in their closing arguments. Solomon, 340 N.C. at 218, 456 S.E.2d at 783.
Defendant contends the prosecutor improperly insinuated that defendant obtained a different psychologist because his first court-appointed psychologist, Dr. Matthews, did not "say the right things." In fact, defendant only obtained a different psychologist after Dr. Matthews' license was suspended.
During the prosecutor's guilt-innocence phase closing argument, he stated:
There's not one shred of evidence - oh yes you have a Dr. - Dr. Rogers who came in at $200 an hour that says that he's got a cocaine dependency based on some information that she received from - from talking to the defendant, talking to some family members, and looking over some records. . . .
The prosecutor also told the jury that Dr. Rogers, defendant's expert, had first seen defendant nearly a year after the crime. Next, the prosecutor asked the jury, "[W]hat happened to Matthew, Dr. Matthew the one - one that saw him in September? Where's he? Didn't he say the right things?" The trial court sustained defendant's objection to the comment, "Didn't he say the right things?"
Hence, the trial court sustained defendant's objection to the problematic remark which suggested that defendant's first expert may not have provided a favorable opinion to the defense. Although defendant failed to request a curative instruction, the trial court had instructed the jury at the beginning of the trial that, "[w]hen [the trial court] sustain[s] an objection to a question, you as a juror must disregard the question and answer,if one has been given, and draw no inference from the question or answer."
Defendant further argues that the prosecutor's entire argument concerning Dr. Matthews was grossly improper. However, defendant's closing argument focused largely on Dr. Rogers' testimony that defendant's cocaine dependence and consumption on the day of the murder impeded defendant's ability to reason, plan, and think. Accordingly, the prosecutor was entitled to some latitude in responding to this argument. In any event, after thoroughly reviewing the prosecutor's argument, we conclude that the prosecutor was properly challenging the credibility of the opinion of defendant's expert. We thus find no error here and we overrule defendant's assignment of error.
CAPITAL SENTENCING PROCEEDING
Defendant argues that the trial court erred in allowing the jury to find as aggravating circumstances that the murder was committed during a kidnapping and that the murder was committed during a robbery. See N.C.G.S. § 15A-2000(e)(5) (2003). Defendant argues that these aggravating circumstances were based on the same evidence and were thus duplicative.
The following are the relevant aggravating circumstances submitted to the jury:
(1) Was this murder committed while the defendant was engaged in the commission of robbery?
(2) Was this murder committed while the defendant was engaged in the commission of kidnapping?
See id. ("The capital felony was committed while the defendant was engaged, or was an aider or abettor, in the commission of, or an attempt to commit, or flight after committing or attempting tocommit, any homicide, robbery, rape or a sex offense, arson, burglary, kidnapping, or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb.").
Every aggravating circumstance submitted by the trial court in a capital sentencing proceeding must be supported by independent evidence. State v. Quesinberry, 319 N.C. 228, 239, 354 S.E.2d 446, 452-53 (1987), judgment vacated on other grounds, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990). However, if there is separate substantial evidence to support each submitted aggravating circumstance, it is not error for some evidence supporting the aggravating circumstances to overlap. State v. White, 355 N.C. 696, 709, 565 S.E.2d 55, 64 (2002), cert. denied, 537 U.S. 1163, 154 L. Ed. 2d 900 (2003); State v. Conaway, 339 N.C. 487, 530, 453 S.E.2d 824, 851, cert. denied, 516 U.S. 884, 133 L. Ed. 2d 153 (1995). More specific to the present case, when separate and distinct evidence supports two aggravating circumstances within the same statutory subsection, submission of each aggravating circumstance is proper. State v. Cheek, 351 N.C. 48, 76, 520 S.E.2d 545, 561 (1999) (finding no error in the trial court's submission of separate aggravating circumstances under N.C.G.S. § 15A-2000 (e)(5) based on defendant's commission of a robbery and a kidnapping during the course of the murder), cert. denied, 530 U.S. 1245, 147 L. Ed. 2d 965 (2000); State v. Bond, 345 N.C. 1, 34-35, 478 S.E.2d 163, 181 (1996), cert. denied, 521 U.S. 1124, 138 L. Ed. 2d 1022 (1997) (same); see also State v. Trull, 349 N.C. 428, 454, 509 S.E.2d 178, 195 (1998) (no error to submit both rape and kidnapping as aggravating circumstances under subsection (e)(5)), cert. denied, 528 U.S.835, 145 L. Ed. 2d 80 (1999). In short, aggravating circumstances may be submitted unless the supporting evidence completely overlaps. State v. Miller, 357 N.C. 583, 595, 588 S.E.2d 857, 866 (2003), cert. denied, __ U.S. __, 159 L. Ed. 2d 819 (2004); State v. Moseley, 338 N.C. 1, 54, 449 S.E.2d 412, 444 (1994), cert. denied, 514 U.S. 1091, 131 L. Ed. 2d 738 (1995). Accordingly, our analysis in the present case must begin with consideration of whether distinct evidence was presented to support a finding that defendant committed a robbery and a kidnapping during the course of the murder.
A robbery occurs when a defendant feloniously takes money or goods of any value from the person of another against that person's will, by violence or by putting that person in fear. State v. Daniels, 337 N.C. 243, 267, 446 S.E.2d 298, 313 (1994), cert. denied, 513 U.S. 1135, 130 L. Ed. 2d 895 (1995).
A kidnapping occurs when a defendant unlawfully confines, restrains, or removes from one place to another, any other person sixteen years of age or over without the person's consent, "for the purpose of . . . [f]acilitating the commission of any felony." N.C.G.S. § 14-39(a)(2) (2003). However, a defendant is not guilty of kidnapping if the only evidence of restraint is that restraint which is an inherent, inevitable feature of another felony. State v. Beatty, 347 N.C. 555, 559, 495 S.E.2d 367, 369 (1998). The defendant is guilty of kidnapping if the defendant takes acts that cause additional restraint of the victim or increase the victim's helplessness and vulnerability. Id. at 559, 495 S.E.2d at 370.
In the present case, separate evidence supported the kidnapping and the robbery. Defendant robbed the victim bygrabbing the victim around the neck and rendering him unconscious. At this point, defendant was free to steal the items he wanted and leave. However, defendant took the additional steps of binding the victim's wrists and ankles and taping his mouth. This binding and taping was not an inherent, inevitable part of the robbery. Rather, these forms of restraint exposed the victim to a greater danger than that inherent in the robbery and constituted a kidnapping. Accordingly, separate and distinct evidence supported the existence of both aggravating circumstances. See Cheek, 351 N.C. at 54-55 and 76, 520 S.E.2d at 549-50 and 561 (finding no error in submission of two (e)(5) aggravating circumstances based on both robbery and kidnapping during murder when co-defendants forced victim out of her car with a gun, struck her in the head, tied her up and placed her in the backseat or trunk, drove the car to Wilmington, and burned the vehicle with the victim in the trunk); Beatty, 347 N.C. at 559, 495 S.E.2d at 370 (finding defendant's acts of putting duct tape on the victim's wrists, forcing him to lie on the floor, and kicking him in the back twice were not inherent, inevitable parts of the robbery and thus constituted evidence supporting defendant's kidnapping conviction); Bond, 345 N.C. at 13 and 34-35, 478 S.E.2d at 168 and 181 (finding no error in submission of three (e)(5) aggravating circumstances based on a robbery and two kidnappings where defendants kidnapped two victims and forced them to drive around for hours while defendants forced one victim to assist them in several attempted robberies).
We also note that defendant alludes to the trial court's failure to instruct the jury specifically that it should not use the same evidence to support a finding of both (e)(5)aggravating circumstances submitted. Indeed, a trial court's instructions should ensure that jurors will not use the same evidence to find more than one aggravating circumstance. State v. Gay, 334 N.C. 467, 495, 434 S.E.2d 840, 856 (1993). In the present case, the trial court's jury instruction, given pursuant to 1 N.C.P.I.-Crim. 210.25 (2001), provided that: "[K]idnapping is the unlawful restraint of another person without - without their consent for the purpose of facilitating the commission of robbery, which restraint was a separate complete act independent of and apart from the robbery." (Emphasis added). We must assume that the jury obeyed this instruction and identified evidence of separate restraint separate from the robbery. See State v. Jennings, 333 N.C. 579, 618, 430 S.E.2d 188, 208 (stating that jurors are assumed to follow a trial court's instructions in a criminal case), cert. denied, 510 U.S. 1028, 126 L. Ed. 2d 602 (1993). In any event, the trial court's jury instructions did not constitute prejudicial error.
We conclude this assignment of error is without merit.
Next, defendant argues that the trial court erred in excluding the following mitigating evidence: defendant's expression of remorse that was offered via testimony from defendant's mother and a minister; defendant's adjustment to incarceration that was shown by defendant's behavior compared to other inmates and by defendant's willingness to take on responsibilities not given to other inmates; and defendant's practice of religion in a manner that helped other inmates; and defendant's support if given a life sentence via the expectation that various people would make regular visits to see defendant in prison. While a trial court should allow the jury to consider any mitigating evidence related to a defendant's character and record or the circumstances of the crime, the feelings, actions, and conduct of third parties have no mitigating value as to defendant and are irrelevant in capital sentencing proceedings. State v. Locklear, 349 N.C. 118, 160-61, 505 S.E.2d 277, 302 (1998), cert. denied, 526 U.S. 1075, 143 L. Ed. 2d 559 (1999). For example, Locklear held that the trial court properly excluded mitigating evidence attacking the character of the victim of one of the defendant's prior assaults because the evidence did not "shed[] light on defendant's age, character, education, environment, habits, mentality, propensities, or criminal record, or on the circumstances of the offense for which defendant was being sentenced". Id. at 159, 505 S.E.2d at 301.
We turn first to defendant's proposed evidence revealing his remorse for the killings. In the present case, the trial court submitted a non-statutory mitigating circumstance that "the defendant has expressed remorse for the crime." Defendant argues that the trial court erred in refusing to allow presentation of certain evidence supporting this mitigating circumstance.
Defendant references the following exchange during the testimony of defendant's mother:
[DEFENSE COUNSEL]: What have you actually observed and heard from him concerning this matter.
[MOTHER]: He's very sorry.
I know if it had not been for the crack -
[PROSECUTOR]: Objection, if Your Honor please.
THE COURT: Sustained.
[DEFENSE COUNSEL]: Now don't tell me what you know, okay.
[MOTHER]: Okay.
[PROSECUTOR]: But you say he was-he's very sorry.
[MOTHER]: Yes.
The trial court sustained an objection to defendant's mother's statement as to what she "know[s]." This testimony was clearly an irrelevant statement of a third party's feelings concerning punishment. See Locklear, 349 N.C. at 161, 505 S.E.2d at 302. Even assuming arguendo that the trial court erred in excluding the statement from defendant's mother, defendant was not prejudiced by this exclusion because defendant's mother immediately testified that defendant was sorry. See State v. Jones, 339 N.C. 114, 153-54, 451 S.E.2d 826, 847-48 (1994) (holding the trial court's exclusion of evidence of remorse was not prejudicial because the defendant was allowed to admit other evidence of his remorse), cert. denied, 515 U.S. 1169, 132 L. Ed. 2d 873 (1995).
Defendant also argues that the trial court erred in excluding testimony from prison minister Christopher Bryant concerning defendant's remorse. Based on our review of the record, it appears Bryant was going to testify about defendant's consideration of suicide and his feelings about his children and mother. We conclude that such evidence is irrelevant to defendant's character and record or the circumstances of the crime. See State v. Hardy, 353 N.C. 122, 132-33, 540 S.E.2d 334, 343 (2000), cert. denied, 534 U.S. 840, 151 L. Ed. 2d 56 (2001). We turn next to defendant's evidence that he was adjusting well to life in prison. At defendant's request, the trial court submitted a nonstatutory mitigating circumstance that defendant had demonstrated good behavior while in jail awaiting trial. Defendant argues that the trial court improperly excluded testimony supporting this mitigating circumstance. Defendant was permitted to present testimony from John Wright, the chief jailer at the Washington County Jail, that defendant was given duties at the jail including buffing and waxing floors, that defendant is a good inmate who has helped the jail staff maintain order in the jail by calming inmates who are "fuss[ing]" or "quarrel[ling]" with each other, and that defendant has never caused problems or received a reprimand while in jail.
A capital defendant is permitted to introduce evidence from a disinterested witness that the defendant has adjusted well to confinement. Skipper v. South Carolina, 476 U.S. 1, 8, 90 L. Ed. 2d 1, 9 (1986). The Court in Skipper found such testimony to be especially warranted because the prosecutor in that case argued that the defendant could not be trusted to act appropriately if he were returned to prison. Id. at 8, 90 L. Ed. 2d at 9.
Similarly, in the present case, the prosecutor argued that the only way to insure that defendant would not kill again was for the jury to sentence defendant to death. However, the trial court appropriately allowed defendant to present mitigation evidence from John Wright that defendant had made a good adjustment to jail. This permitted the jury to infer that defendant would not kill again if given a life sentence. The trial court excluded only defendant's proposed evidence relatingto how defendant's conduct and duties in jail related to other inmates' conduct and duties. This evidence did not bear on whether defendant would kill again if given a life sentence. Moreover, the excluded evidence was irrelevant to defendant's character and record or the circumstances of defendant's crime. See Locklear, 349 N.C. at 160-61, 505 S.E.2d at 302.
Defendant also refers in his brief to excluded evidence showing he had family members who would support him if he received a life sentence. Again, this evidence is not related to defendant's character and record or the circumstances of defendant's crime and is thus irrelevant for sentencing purposes.
The Court next turns to defendant's proposed evidence concerning his religious beliefs. At defendant's request, the trial court submitted the following nonstatutory mitigating circumstance to the jury: "The defendant has exhibited religious beliefs and practices since incarcerated in the Washington County Jail while awaiting trial and sentencing on this matter." Defendant's brief appears to identify Christopher Bryant's proposed testimony concerning defendant's practice of ministering to other inmates as the critical excluded evidence on this issue. Our review of the record reveals that defendant was allowed to present Bryant's testimony that Bryant met defendant while ministering to inmates, that defendant willingly attended Friday night services at the jail for about one year, and that defendant approached Bryant during this time. The trial court excluded Bryant's testimony that defendant's involvement in the services was "dedicated because he didn't have to, but he did help other inmates." This testimony improperly focused on the opinion of a third party rather than defendant's character and record or thecircumstances surrounding defendant's crime. See id. The trial court properly excluded this testimony.
This assignment of error is without merit.
Defendant next argues that the trial court erred in failing to intervene during the prosecutor's sentencing phase closing argument when the prosecutor interjected opinions concerning information outside the record and made unfair emotional appeals to jurors.
Defendant assigns error to the following portion of the prosecutor's sentencing phase closing argument:
I would say to you, if you choose not to exercise the option of the death penalty, can you guarantee that Reche Smith would not get a piece of tape, a cord sometime and kill again, can you? He's killed now. The only way to insure that he won't kill again is the death penalty.
Justice-justice is making sure that Reche Smith is not ever going to do this again. You-you ladies and gentlemen, you are the only thing standing between the defendant. The only way that you can be sure that this man will never kill again, walk out again is to give him the death penalty.
Defendant suggests that this argument was improper because defendant could not "walk out again" if given a life sentence because defendant would never be eligible for parole.
We first note that defendant failed to object to this argument. "'[ T]he impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting ex mero motu an argument which defense counsel apparently did not believe was prejudicial when he heard it.'" State v. Kemmerlin, 356 N.C. 446, 470, 573 S.E.2d 870, 887 (2002) (quoting State v. Johnson, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979)). In such acircumstance, the prosecutor's closing argument "is subject to appellate review for the existence of gross improprieties which make it plain that the trial court abused its discretion in failing to correct the prejudicial matters ex mero motu." State v. Harris, 319 N.C. 383, 387, 354 S.E.2d 222, 224 (1987).
While it would be improper for a prosecutor to argue that a defendant's parole eligibility should affect the jury's sentencing considerations, see, e.g., State v. Price, 337 N.C. 756, 759-60, 448 S.E.2d 827, 829 (1994), cert. denied, 514 U.S. 1021, 131 L. Ed. 2d 224 (1995), a prosecutor may urge the jury to reach a death sentence based on a fear of the defendant's future dangerousness. State v. Cummings, 352 N.C. 600, 627, 536 S.E.2d 36, 55 (2000), cert. denied, 532 U.S. 997, 149 L. Ed. 2d 641 (2001). In the present case, the prosecutor momentarily mentioned that defendant might "walk out again," but the prosecutor never specifically mentioned defendant's being paroled or leaving prison. Further, defendant's closing argument in sentencing began with defendant's attorney informing the jury that its guilty verdict "assured that [defendant] will die in prison" and that the remaining question for sentencing was "will [defendant] die in prison when his [M]aker calls him or will [defendant] die in prison strapped to a gurney with a needle in his arm-." Accordingly, when both parties' closing arguments are read in their entirety, we cannot conclude that the jury believed that defendant might one day leave prison.
Moreover, our review of the record indicates that on at least four occasions, the trial court instructed the jury that if they did not recommend sentencing defendant to death, they must recommend sentencing him to "life imprisonment without parole." Additionally, the trial court instructed the jury that "[i]f [they] unanimously recommend a sentence of life imprisonment without parole, [the trial court] will impose a sentence of life imprisonment without parole." The trial court alluded to only two possible sentences, death or life imprisonment without parole. Therefore, if the jury followed these instructions, they knew of only these two possible sentences. We must presume that the jury followed these instructions. Accordingly, we cannot conclude that the prosecutor's statement constituted prejudicial error sufficient to require a new sentencing hearing.
This assignment of error is overruled.
Next, defendant argues that the trial court erred in submitting the aggravating circumstance that the murder was especially heinous, atrocious, or cruel. See N.C.G.S. § 15A-2000(e)(9) (2003). Defendant contends that this aggravating circumstance was not supported by the evidence and is unconstitutionally vague.
Turning first to the evidence supporting the (e)(9) aggravating circumstance, we note that "[t]he trial court, in determining the sufficiency of the evidence to support the existence of an aggravating circumstance, must consider the evidence in the light most favorable to the State." State v. Frogge, 351 N.C. 576, 586, 528 S.E.2d 893, 900, cert. denied, 531 U.S. 994, 148 L. Ed. 2d 459 (2000). "'The State is entitled to every reasonable inference to be drawn from the evidence, contradictions and discrepancies are for the jury to resolve, and all evidence admitted that is favorable to the State is to be considered.'" Id. (quoting State v. Leary, 344 N.C. 109, 119, 472 S.E.2d 753, 759 (1996)). "The (e)(9) aggravatingcircumstance can be submitted when the killing is agonizing or dehumanizing to the victim; when the killing is conscienceless, pitiless, or unnecessarily torturous to the victim; or when the murder shows the defendant's mind was unusually depraved, beyond the depravity normally present in first-degree murder." State v. Prevatte, 356 N.C. 178, 261, 570 S.E.2d 440, 486 (2002), cert. denied, 538 U.S. 986, 155 L. Ed. 2d 681 (2003).
The evidence in this case supports each of the situations described in Prevatte:
Expert testimony showed the victim was still alive when defendant bound his hands and feet. Defendant then covered King's head, including King's nose and mouth, with tape and ultimately caused King to suffocate to death. The State's expert, Dr. Spence, estimated that once defendant placed tape on King's nose and mouth, King became brain dead in two to three minutes and his heart stopped beating after ten to twenty minutes. Dr. Spence further testified it was "certainly possible [the victim] could have been aware of his condition, but because of the-because of the injury to his neck, because of the taping around his face could not have the oxygen supply, the ability to-to actually move or to defend himself." This evidence shows the killing was agonizing or dehumanizing to the victim.
Additionally, evidence showed the victim was a seventy-three-year-old man who was attacked in his own home at the mercy of a younger, stronger attacker. See State v. Quick, 329 N.C. 1, 31-32, 405 S.E.2d 179, 197-98 (1991) (finding submission of especially heinous, atrocious, or cruel aggravating circumstance was proper when elderly victim was attacked in his own home). Defendant choked King until King became unconscious, then boundhim, covered his face in tape, and left him to die under a hospital bed. This evidence shows the killing was conscienceless, pitiless, or unnecessarily torturous to the victim.
Finally, the evidence shows defendant's mind was unusually depraved, beyond the depravity normally present in first-degree murder. Defendant gained entry to the victim's house by preying upon King's Good Samaritan instincts. Defendant knocked on King's door and asked him for a glass of water. After King invited defendant into his home and went to get the water, defendant grabbed King and choked him around his neck until King became unconscious. After binding King and taping his face, defendant remained in the victim's home for thirty minutes, searching for items to steal while King suffocated and ultimately died under his bed with his arms and legs bound and his face covered in tape.
The above evidence shows that the facts of this case unquestionably supported submission of the (e)(9) especially heinous, atrocious, or cruel aggravating circumstance.
As to defendant's allegation that N.C.G.S. § 15A-2000 (e)(9) is unconstitutionally vague, this Court has previously held that the especially heinous, atrocious, or cruel aggravating circumstance in subsection (e)(9) is not unconstitutionally vague. See State v. Syriani, 333 N.C. 350, 388-92, 428 S.E.2d 118, 139-41, cert. denied, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). Having reevaluated this prior holding, we find no reason to depart from precedent, and we recognize again the constitutionality of the (e)(9) aggravating circumstance.
This assignment of error is overruled.
PRESERVATION ISSUES
Defendant raises nine additional issues which this Court has previously decided contrary to his position: (1) the trial court violated defendant's statutory and constitutional rights and committed plain error by telling the sentencing jury that it must be unanimous to answer "no" at Issues One, Three, and Four on the Issues and Recommendation sheet; (2) the trial court erred in instructing the jury that it had a duty to return a death sentence if it made certain findings; (3) the trial court's instructions defining the burden of proof applicable to mitigating circumstances violated defendant's constitutional rights because the court used the inherently ambiguous and vague terms "satisfaction" and "satisfy," thus permitting jurors to establish for themselves the legal standard to be applied to the evidence; (4) the trial court committed reversible error by instructing jurors to decide whether nonstatutory mitigating circumstances have mitigating value; (5) the trial court committed reversible error by instructing the jury on a definition of aggravation which was unconstitutionally broad; (6) the trial court committed reversible error by its use of the term "may" in sentencing issues Three and Four, thereby making consideration of proven mitigation discretionary with the sentencing jurors; (7) the trial court committed reversible error in its penalty phase instructions, which allowed each juror in deciding Issues Three and Four to consider only the mitigation found by that juror at Issue Two, thereby limiting the full and free consideration of mitigation required by the state and federal Constitutions; (8) the North Carolina death penalty statute is unconstitutional; and (9) the trial court erred byfailing to dismiss the murder indictment where it unconstitutionally failed to allege all the elements of first-degree murder. Defendant makes these arguments to allow this Court to reexamine its prior holdings and to preserve these issues for any possible further judicial review. We have carefully considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. Therefore, we overrule defendant's assignments of error.
PROPORTIONALITY REVIEW
Having found no error in either the guilt-innocence phase or the sentencing proceeding of defendant's trial, we must determine: (1) whether the evidence supports the aggravating circumstances found by the jury; (2) whether the jury's imposition of the death penalty was influenced by "passion, prejudice, or any other arbitrary factor"; and (3) whether the death sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2) (2003).
In the present case, defendant was convicted of first-degree murder on the basis of malice, premeditation, and deliberation and under the first-degree felony murder rule. Following a capital sentencing proceeding, the jury found the following aggravating circumstances:
(1) This murder was committed while the defendant was engaged in the commission of robbery, id. § 15A-2000(e)(5);
(2) This murder was committed while the defendant was engaged in the commission of kidnapping, id.;
(3) This murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9). The jury also found the existence of the following statutory mitigating circumstance submitted for consideration:
(1) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, id. § 15A-2000(f)(6) (2003).
Additionally, of the thirteen nonstatutory mitigating circumstances submitted for consideration, the jury found the following four to exist:
(1) The defendant's mother, when he was a child, was not a positive influence in his life.
(2) The defendant, as a child, was raised in a dysfunctional and unstable environment.
(3) The defendant has a history of drug use and abuse.
(4) The defendant confessed at an early state of the investigation to John Floyd and Dwight Rawlings.
After reviewing the records, transcripts, briefs, and oral arguments, we conclude that the evidence supports these aggravating circumstances. Additionally, we conclude, based on a thorough review of the record, that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Thus, the final statutory duty of this Court is to conduct a proportionality review.
The purpose of proportionality review is to "eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." State v. Holden, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), cert. denied, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Proportionality review also acts "[a]s a check against the capricious or random imposition of the death penalty." State v. Barfield, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), cert. denied, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980),(overruled in part on other grounds by State v. Johnson, 317 N.C. 193, 203-04, 344 S.E.2d 775, 782 (1986)). In conducting proportionality review, we compare the present case with other cases in which this Court concluded that the death penalty was disproportionate. McCollum, 334 N.C. at 240, 433 S.E.2d at 162.
We have found the death sentence disproportionate in eight cases. Kemmerlin, 356 N.C. at 489, 573 S.E.2d at 898-99; State v. Benson, 323 N.C. 318, 328, 372 S.E.2d 517, 523 (1988); State v. Stokes, 319 N.C. 1, 27, 352 S.E.2d 653, 668 (1987); State v. Rogers, 316 N.C. 203, 237, 341 S.E.2d 713, 733 (1986) (overruled in part on other grounds by State v. Gaines, 345 N.C. 647, 676-77, 483 S.E.2d 396, 414, cert. denied, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), and by State v. Vandiver, 321 N.C. 570, 573-74, 364 S.E.2d 373, 375-76 (1988)); State v. Young, 312 N.C. 669, 691, 325 S.E.2d 181, 194 (1985); State v. Hill, 311 N.C. 465, 479, 319 S.E.2d 163, 172 (1984); State v. Bondurant, 309 N.C. 674, 694, 309 S.E.2d 170, 183 (1983); and State v. Jackson, 309 N.C. 26, 46, 305 S.E.2d 703, 717 (1983).
We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate. Defendant was convicted on the basis of malice, premeditation, and deliberation and under the first-degree felony murder rule. "The finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." State v. Artis, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), judgment vacated on other grounds, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). Further, this Court has repeatedly noted that "a finding of first-degree murder based on theories of premeditation and deliberation and of felony murder is significant." State v.Bone, 354 N.C. 1, 22, 550 S.E.2d 482, 495 (2001), cert. denied, 535 U.S. 940, 152 L. Ed. 2d 231 (2002).
Defendant attacked the seventy-three-year-old victim in the victim's own home. See State v. Adams, 347 N.C. 48, 77, 490 S.E.2d 220, 236 (1997) (noting that "[a] murder in the home 'shocks the conscience, not only because a life was senselessly taken, but because it was taken [at] an especially private place, one [where] a person has a right to feel secure'") (alterations in original) (quoting State v. Brown, 320 N.C. 179, 231, 358 S.E.2d 1, 34, cert. denied, 484 U.S. 970, 98 L. Ed. 2d 406 (1987)), cert. denied, 522 U.S. 1096, 139 L. Ed. 2d 878 (1998). Defendant grabbed the victim around the neck and strangled him by pressing on the victim's neck with defendant's forearm. While the victim was still alive, defendant bound the victim's hands and legs and wrapped tape around the victim's face. There was testimony at trial that the victim did not die immediately but instead was forced to struggle helplessly to free himself even as he slowly died from asphyxiation. The facts of the present case clearly distinguish this case from those in which this Court has held a death sentence disproportionate.
We also compare this case with the cases in which this Court has found the death penalty to be proportionate. McCollum, 334 N.C. at 244, 433 S.E.2d at 164. Although we review all cases in the pool of "similar cases" when engaging in our statutorily mandated duty of proportionality review, "we will not undertake to discuss or cite all of those cases each time we carry out that duty." Id.; accord State v. Gregory, 348 N.C. 203, 213, 499 S.E.2d 753, 760, cert. denied, 525 U.S. 952, 142 L. Ed. 2d 315 (1998). After thoroughly analyzing the present case, we concludethat this case is more similar to cases in which we have found the sentence of death proportionate than to those in which we have found it disproportionate.
Whether a sentence of death is "disproportionate in a particular case ultimately rest[s] upon the 'experienced judgments' of the members of this Court." State v. Green, 336 N.C. 142, 198, 443 S.E.2d 14, 47, cert. denied, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994). Therefore, based upon the crime defendant committed and the record of this case, we are convinced the sentence of death recommended by the jury and ordered by the trial court in the instant case is not disproportionate or excessive.
Accordingly, we conclude defendant received a fair trial and capital sentencing proceeding, free from prejudicial error. The judgment and sentence entered by the trial court must therefore be left undisturbed.
NO ERROR.
Justice NEWBY did not participate in the consideration or decision of this case.